SOO LINE RAILROAD COMPANY,
Plaintiff,

and

Railroad Labor Executives' Association
and Brotherhood of Locomotive En-
gineers, Intervenor-Plaintiffs,

v.

UNITED STATES of America and In-
terstate Commerce Commission,
Defendants,

and

Chicago and North Western Railway Com-
pany and Chicago Great Western Rail-
way Company, Intervenor-Defendants.

No. 4-67 Civil 318.

United States District Court
D. Minnesota,
Fourth Division.

Jan. 30, 1968.

Fordyce W. Crouch, Charles H. Clay, C. Harold Peterson, Robert G. Gehrz, and Lindquist, Magnuson & Glennon, by Edward M. Glennon and Kenneth F. Kirwin, Minneapolis, Minn., for Soo Line Railroad Co.

Vennum, Newhall, Ackman & Goetz, by Thomas Vennum, Minneapolis, Minn., and Mulholland, Hickey & Lyman, by William G. Mahoney, Washington, D. C., for Railway Labor Executives' Association and Brotherhood of Locomotive Engineers.

Donald F. Turner, Asst. Atty. Gen., Patrick J. Foley, U. S. Atty., and John H. D. Wigger, Atty., Dept. of Justice, for the United States; and Robert W. Ginnane, Gen. Counsel, Henri F. Rush, Jr., Atty., and Fritz R. Kahn, Associate Gen. Counsel, for Interstate Commerce Commission.

Richard M. Freeman, Chicago, Ill., Wheeler & Wheeler, by Edward K. Wheeler and Robert G. Seaks, Washington, D. C., and Stringer, Donnelly & Sharood, by Philip Stringer, St. Paul, Minn., for Chicago and North Western Railway Co.

Winston, Strawn, Smith & Patterson, by Edmund J. Kenny, Chicago, Ill., and Stearns & Goetteman, by Harry S. Stearns, Jr., St. Paul, Minn., for Chicago Great Western R. Co.

Before HEANEY, Circuit Judge and DEVITT, Chief Judge and LARSON, District Judge.

## OPINION

HEANEY, Circuit Judge:

■ This is an action by the Soo Line Railroad Company (Soo), the Railway Labor Executives' Association, and the Brotherhood of Locomotive Engineers pursuant to 28 U.S.C. § 2325 (1964) to enjoin the merger of the Chicago and North Western (NW) and the Chicago Great Western (GW) Railway Compa-

nies. See generally, 28 U.S.C. §§ 2284, 2324 (1964). The merger has been approved by the Interstate Commerce Commission pursuant to § 5(2) of the Interstate Commerce Act, 41 Stat. 481 (1920), as amended, 49 U.S.C. § 5(2). Chicago & North Western Railway Company and Chicago Great Western Railway Company—Merger, Etc., Finance Docket 23388, Report of the Commission (April 20, 1967); Chicago & North Western Railway Company—Issuance of Stock and Assumption of Obligation, Finance Docket 23389, Report of the Commission (April 20, 1967) (hereinafter cited as Report of the Commission) (330 I.C.C. 13 subsequently withdrawn as official opinion, see note 26, infra). The residence and principal office of the Soo being in Minneapolis, Minnesota, venue lies in this District.

The GW, faced with serious financial problems and with an inability to solve them internally, conducted unsuccessful merger negotiations with the Chicago, Rock Island and Pacific Railroad Company (Rock Island), the Soo, and the St. Louis-San Francisco Railway Company. In early 1964, the NW proposed a merger, the terms of which were tentatively accepted by the GW on July 24, 1964. A merger application, filed in November, 1964, was followed by lengthy hearings. The Commission's decision of April 20, 1967, found that substantial benefits would flow to the merging railways, the principal one being a saving of approximately $6,000,000 per year. The Commission found that the savings would be achieved over a five-year period without sacrifice of service to shippers, and would result primarily from the elimination of side-by-side duplicate facilities. The savings, the Commission further found, would serve as an incentive to stimulate investment in equipment and right-of-way, would assure a continuance of GW's operations, and would enable the NW to provide resources for the continued operation of its 730 miles of branch lines in South Dakota, maintenance of which had heretofore been a major problem. The Commission concluded that the merger was in the public interest.

The plaintiffs, while not disputing the benefits to the merging railroads and a segment of the public, contend that the Soo, its employees and the public it serves will be injured by the merger, and that it should thus be enjoined. They maintain that the Commission erred by refusing: (I) to consolidate this application with the NW's application to merge with the Chicago, Milwaukee, St. Paul and Pacific Railroad Company and with its application to control the Rock Island; (II) to impose more extensive conditions for the benefit of the Soo; (III) to impose labor protective conditions for the benefit of Soo's employees.[1] See generally, 60 Stat. 243 (1946), as amended, 80 Stat. 393 (1966); 5 U.S.C. § 1009(e), as amended, 5 U.S.C. § 706 (Supp. II 1967).

## I. CONSOLIDATION.

Contemporaneously with the NW-GW merger, the NW sought to merge with the Milwaukee and to gain control of the Rock Island.[2] The Soo argues that it was an abuse of discretion for the Commission to refuse to consolidate the NW-GW merger proceedings with those of the Milwaukee and the Rock Island. It also urges that the Commission erred in refusing to permit it to introduce evidence in this proceeding as to the effect of the other mergers.[3]

1. The labor protective conditions included provisions against dismissal or loss of benefits and for moving and other expenses, for employees required to change job locations, retraining of certain employees, displacement allowances and separation allowances for employees not desiring to transfer.

2. The NW filed a petition with the Commission in 1963 seeking to gain control of the Rock Island. It did so after the Union Pacific announced, in May of 1963, that it intended to merge with the Rock Island. This proceeding continues.

3. In the light of our decision on the consolidation issue and the reason set forth in support of it, we do not believe it necessary to consider this argument separately.

The Soo's initial motion to consolidate this proceeding with the one involving the NW and the Milwaukee was filed after stockholder approval of the Milwaukee-NW merger had been sought by management. This motion was denied in an order dated January 13, 1965, and because "good cause has not been shown." The petition to reconsider was denied in an order dated February 24, 1965, on the grounds that "it is purely speculative whether, or when [the NW-Milwaukee application] * * * will be filed." A later request made after stockholder approval of the NW-Milwaukee merger was rejected on the grounds "that the vote of the stockholders does not make the filing of such a merger application any more certain as to when it will be filed." That order was dated June 3, 1965. Subsequent requests for consolidation made by the Soo after the filing of the NW-Milwaukee application to merge do not appear to have been specifically ruled upon.[4]

The Soo's motion to consolidate the Rock Island proceedings with this one was denied in an order dated August 17, 1966, on the grounds that such consolidation "would require an infinite delay in decision in the instant proceedings and is not essential in affording due process to the parties of record in the disposition of those proceedings and that infinite postponement of the decision herein would be unreasonable."

In considering whether the Commission abused its discretion in refusing to consolidate, we recognize the absence of an explicit statutory directive requiring consolidation. Nevertheless, § 17(3) of the Interstate Commerce Act, 49 U.S.C. § 17 (1964), does provide that "[t]he Commission shall conduct its proceedings * * * in such manner as will best conduce to the proper dispatch of business and to the ends of justice." The Commission and United States, in brief, recognize that the Commission's refusal to consolidate may not "prejudice any substantial right of any party to the proceeding or preclude the Commission from properly performing its responsibilities under Section 5(2) of the Act." Cf., American Trucking Asso. v. United States, 326 U.S. 77, at 83, 65 S.Ct. 1499, at 1501, 89 L.Ed. 2065 (1945); Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940).

The consolidation issue was most recently discussed by the Supreme Court in the "Penn-Central" merger cases B & O R. Co. v. United States, 386 U.S. 372, 87 S.Ct. 1100, 18 L.Ed.2d 159 (1967) (Preliminary Print), and Penn-Central Merger and N & W Inclusion Cases, 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723, January 15, 1968. The Court refused to approve that merger on the first appeal on the grounds that the Commission had found that the survival of the Erie-Lackawanna, the Delaware and Hudson, and the Boston and Maine, was essential to the public interest and that those roads would be so seriously affected by the competition of the merged company that they might not be able to survive unless adequate protective arrangements were made.[5] It went on to require that the

4. The Commission was apparently of the opinion that in rejecting the Soo's motion to consolidate with the Rock Island proceedings, which motion also referred to the NW–Milwaukee proceeding, it had adequately ruled on both motions. In the light of our decision, an independent discussion of this issue is not required.

5. The Port of New York Authority and the City of New York, the Boston and Maine, and the New England Council requested consolidation of the *Penn-Central* and the *Norfolk & Western-Nickel Plate* proceedings. The Commission apparently viewed this request as a corollary to one to postpone consummation of the Penn-Central merger until three smaller railroads (the Erie-Lackawanna, the Delaware and Hudson, and the Boston and Maine) had been assured of inclusion in the Norfolk & Western-Nickel Plate merger. See, Pennsylvania Railroad Company-Merger-New York Central Railroad Company, 327 I.C.C. 475, 528–29 (1966).

The Commission denied the request, again largely equating the consolidation

Commission determine the means of preserving the protected roads on both an interim and permanent basis before permitting consummation of the merger, and specifically to determine whether the smaller roads ought to be incorporated in the Norfolk and Western or the Penn-Central system. Mr. Justice Clark, speaking for the Court, noted:

> " * * * The Commission has * * * not proceeded by or under 'a master plan' for consolidation in the various regions. Following this procedure the Commission has refused to consolidate the Northeastern Region railroad merger or control proceedings into one case."

B & O R. Co. v. United States, supra, 386 U.S. at 387, 87 S.Ct. at 1107.[6]

Mr. Justice Brennan, in a concurring opinion, was highly critical of the Commission's refusal to consolidate:[7]

> "Although a case-by-case adjudication may offer advantages in flexibility

and continual exposure to concrete situations, 'the disadvantages of developing policy through a sequence of limited cases are both numerous and impressive.' H.R. Doc. No. 678, supra, p. 81. A significant disadvantage is that individual proceedings 'seldom if ever produce sufficiently comprehensive records for the adequate solution of questions of major importance.' Id., at 82. Obviously, without all the relevant facts, the chance of a satisfactory disposition is diminished. Although the ICC has tools to assemble complete factual records, it employed virtually none of them in these highly interrelated proceedings, including the power to consolidate the proceedings on common issues. Rather, the cases have been rigidly segregated, leading the ICC to resort to extraordinary interim conditions instead of resolving definitely the fate of the three threatened roads. * * * " [8]

---

request with the request merely to postpone consummation of the Penn-Central merger.

6. The consolidation issue was referred to in a single sentence in the District Court case: "Decision whether to handle all these consolidations in one giant proceeding or in several rests in the sound judgment of the Commission subject only to its management of the various proceedings so as to promote an ultimate solution fair to the carriers and consistent with the public interest, a task in which it has displayed considerable ingenuity." Erie-Lackawanna Railroad Company v. United States, 259 F.Supp. 964, 972 (D.C.S.D.N.Y.1966).

7. We also note the language of Mr. Justice Brennan indicating the possibility that the Interstate Commerce Commission may give informal consideration to various plans for consolidation:

> "There are indications that the ICC has planned all along for three systems. The most striking of these is the use by the Penn-Central Examiners of a chart to evaluate the merger's anticompetitive effect which accounts for all the smaller roads. Penn-Central Report, Appendix T–2. It need hardly be said that the ICC would be proceeding unlawfully if it had determined, without notice or hearing, that a three-system

structure was essential, and had then gone through the motions of adjudication."

B&O R. Co. v. United States, 386 U.S. 372, 430 n. 25, 87 S.Ct. 1100, 1130, 18 L.Ed.2d 159 (1967) (Preliminary Print).

He also noted:

> " * * * Evidence of competitive impact has been withheld in one proceeding only to appear at later proceedings in the form of evidence that the company affected must be permitted to merge with another company to protect itself, or that the anticompetitive impact of the later merger will be limited in light of the increased strength and ability to compete of the companies already allowed to merge. * * * "

Id. at 432–433, 87 S.Ct. at 1131 (footnote omitted).

8. Justice Douglas, dissenting in part, made a similar observation:

> "The Commission's piecemeal, hands-off approach to the merger problem is, however, not commanded by the Transportation Act of 1940. There is no evidence that Congress intended to remove entirely the planning and policy function of the Commission with respect to rail consolidations. Indeed, such a position ignores the mandate of the preamble to the Act of 1940, which

Id. at 431–32, 87 S.Ct. at 1130–1131 (footnote omitted).

On remand, the Commission ordered that the Norfolk and Western acquire the stock of the three railroads on prescribed terms. Norfolk & Western Railroad Company and New York, Chicago, and St. Louis Railroad Company—Merger, etc., 330 I.C.C. 780, 796 (1967). It also re-approved the Penn-Central merger but imposed additional protective conditions for the three smaller railroads in the interim. Pennsylvania Railroad Company—Merger—New York Central Railroad Company, 330 I.C.C. 328 (1967). The District Court for the Southern District of New York sustained the Commission's decision. Erie-Lackawanna Railroad Company v. United States, 279 F.Supp. 316. (October 19, 1967). The Supreme Court affirmed, Penn-Central and N & W Inclusion Cases, supra, stating:

" * * * The merger and the inclusion orders are part of a vast reorganization of rail transportation implementing the congressional policy of en-

couraging consolidation of the Nation's railroads into a 'limited number of systems.' * * * Under the 1940 Act, the initiation of merger and consolidation proceedings is left to the carriers themselves, and the Commission possesses no power to compel carriers to merge. However, the congressional directive for a limited number of railroad systems has not been changed. The only change has been in the means of achieving that goal. * * * "

*Ibid.*

■ We believe the *Penn-Central* cases are distinguishable, but it seems that the Commission is not required, as a matter of law, to consolidate all regional merger proceedings. It is, however, required to impose those protective conditions which are necessary to insure the survival of affected railroads before permitting a merger to proceed.[9]

■ There is merit to the contention of the Soo that consolidation of the pending Midwest mergers would have

provides that its provisions shall be administered with a view to 'promote . . . adequate, economical, and efficient service and foster sound economic conditions in transportation and among the sveral carriers; . . . all to the end of developing, coordinating, and preserving a national transportation system.' * * * [I]t would be 'incongruous to assert that the change from the 1920 Act approach to that of the 1940 Act signifies a change from planning to strictly *ad hoc* adjudication.' Post, p. 1128. The Commission has ample authority to insure a co-ordinated approach to railroad consolidations; it is not straitjacketed to a disjointed case-by-case approach. * * * "

Id. at 441, 87 S.Ct. at 1137.

9. Vice Chairman Tierney, in a dissenting opinion in Great Northern Pac. & B. Lines, Merger—Great Northern, et al., 331 I.C.C. 228 (1967), suggests that tentative opinions could serve as an alternative to consolidation of proceedings: "In addition to the time, effort, and money which the use of a 'tentative' decision would save for all parties and the Commission, such an approach (1)

would enable us to view the general railroad restructuring in the West in a sharper and more realistic perspective; (2) would inform all parties of our views with each 'tentative' decision in the western realignment; (3) would allow us, after separate or consolidated proceedings—if such proceedings were necessary—to provide appropriate relief from the adverse cumulative and cross effects of a second or third merger in combination with the first— and (4) could be used to insure that effective rail competition remained in the northern and central corridors after consummation of any merger. Lastly, if and when our final orders are challenged, the courts would gain a *total*, as opposed to a *fragmented*, picture of our considerations in the western railroad mergers. Under the majority's approach, the courts and the parties are left to speculation. As the Supreme Court has emphasized repeatedly 'We must know what a decision means before the duty becomes ours to say whether it is right or wrong.' United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 511 [55 S.Ct. 462, 79 L.Ed. 1023]." Id. at 292–93.

permitted a more thorough consideration of their overall impact on the area served, a better assessment of the cumulative effects of the second and third mergers, and a better basis for judicial review. But, the Commission did not require consolidation and we can do so now only if its failure to do so was an abuse of its broad discretion.

■ In reaching our decision, we must of necessity, though with reluctance, give weight to the argument of the Commission that consolidation at this late date would cause a serious delay.[10] We must also consider: (1) that the GW needs and, for a number of years, sought but found no other merger partner, nor is one now available; (2) that the benefits of a prompt decision to the merging railways and the areas they serve are clear and substantial, and injuries from a long delay would be substantial; (3) that the Soo, its employees and the area it serves can be adequately protected by the imposition of proper protective conditions; (4) that the Commission has retained jurisdiction to impose whatever additional protective conditions are necessary in the event that NW is given permission to merge with the Milwaukee or to control the Rock Island;[11] (5) that the Soo is being given an opportunity to present testimony as to the impact of these mergers on it in the Milwaukee and Rock Island proceedings; and (6) most importantly, the NW-GW merger, while of significance to the applicants and the public they serve, is not of such importance that it will materially affect the restructuring of the Midwestern railways which is now taking place nor of such import that it will neither serve to support or impede other mergers pending in the region.

Concerning these facts and that the Supreme Court has not held that the Commission must consolidate all current and related merger proceedings, we hold that it was not an abuse of discretion to refuse to do so here.

## II. THE PROTECTIVE CONDITIONS FOR THE SOO.

The Soo, while conceding the benefits of the merger to the NW and GW, contended before the Trial Examiner and the Commission that the NW-GW merger, without the imposition of conditions, would divert $1,700,000 in revenue from it.

It stated that the diversion would require the reduction of dividends or capital expenditures and the curtailment of expenditures on maintenance of equipment and right-of-way. This diversion, it maintained, would make it less competitive and less able to serve the public. It requested that fourteen conditions be imposed on the NW-GW for its benefit, and stated that the conditions would indemnify it for its losses and enable it to compete effectively and continue to serve the public interest.

A review of the Trial Examiner's findings and recommendations and the exceptions taken thereto are helpful in analyzing the Commission's decision. In making this review, we do not intend to suggest to the Commission that they are obliged to adopt the findings and conclusions of the Trial Examiner, but we would note that his findings and conclusions came much closer to meeting the test of substantiality and adequacy than those of the Commission.

The Trial Examiner, after an exhaustive hearing, found: that the Soo and the NW operate over extensive competi-

10. The applicants state that a final decision in the Milwaukee proceeding is at least three years away; and, in the Rock Island, at least five years away. This contention is not seriously challenged by the Soo.

11. The Commission stated: "Since the North Western is now involved in proceedings to become affiliated with both

Milwaukee and Rock Island and the outcome of those proceedings could affect the relationship among the carriers here involved, we shall retain jurisdiction to review the conditions imposed herein, either upon proper petition or upon our own motion, and to make such modifications as may be appropriate, just and reasonable." We believe this reservation to be a proper one.

tive routes, serve fifty-six points in common with interchange facilities at thirty-two points (with those at Chicago, Minneapolis, St. Paul and Ashland being significant), and perform switching services at common points for one another; that the Soo's relationship with the GW was that of a friendly connection; that although the Soo and the GW compete for traffic between Chicago and the Twin Cities, they jointly solicit traffic in other areas, including areas in which the NW is the now principal competitor; that they have common interchange points at Minneapolis, St. Paul and Chicago; that interchange between the GW and the Soo, at Minneapolis, is accomplished through intermediaries; and that the Soo has a direct connection with the GW, in Chicago, which has enabled it to provide a fast and reliable service to and from the GW on movements from Wisconsin to Iowa, Kansas City and Omaha, in competition with the NW.

The Examiner fund that substantial traffic would be diverted by the merger from the Soo to the NW-GW because: (1) the Soo would lose the GW as a partner "and co-solicitor"; (2) rate changes by the NW-GW would permit it to preclude the Soo from participating in traffic originating or terminating at the Roseport industrial park; (3) the elimination of time-consuming interchanges in Minneapolis and Chicago would increase the NW-GW's share of traffic because of more direct and rapid service; and (4) the creation of single line service by the NW-GW would cause shippers to favor it where joint line service (e. g., Soo-GW) is currently used. He concluded, however, that the diversion would be less than that estimated by the Soo because many shippers have a policy of allocating traffic, because the Soo has a superior track location in some instances and because the Soo's financial relationship with the Canadian Pacific should enable it to meet many of the improvements in service and operations anticipated under the merger plan.

The Examiner then stated:

" * * * [T]he imposition of certain protective conditions . are necessary * * * to protect Soo from material diversion * * *. * * * [T]he loss of C.G.W. [Chicago Great Western] as a partner and co-solicitor is the most significant element of diversion. Implicit therein is the loss of a friendly access to industry served by C.G.W. or industries which consider the latter important in their allocation policies. It is clear that no condition which the Commission can impose could preserve this friendly relationship for tied thereto is the economic incentive necessary to make it work. * * * "

Chicago and North Western Railway Company and Chicago Great Western Railway Company Merger, Report and Order recommended by the Hearing Examiner, Finance Docket 23388, 23389, p. 99 (March 3, 1966) (hereinafter cited as Report of the Examiner).

He recommended the imposition of four special conditions for the benefit of the Soo: (1) direct access to the Roseport area over the tracks of the GW; (2) direct interchange with the NW-GW at its West Minneapolis yard; (3) an expedited interchange with the NW-GW at Chicago, and (4) a direct, feasible and economic interchange with the Rock Island and Milwaukee at Minneapolis through the use of the NW-GW tracks and yards.

He denied the remaining conditions requested by the Soo, stating:

" * * * [T]he conditions imposed * * * will leave Soo in as relatively good a competitive position as before merger. * * * To the extent, however, such conditions do not protect Soo fully from diversion, it is the examiner's conclusion that *such losses will be de minimus and of no consequences.* * * * " (Emphasis added).

Id. at 102.

The applicants took vigorous exception to the conditions imposed by the Exam-

iner,[12] arguing: (1) that the Roseport condition would disrupt existing traffic conditions in the Twin Cities area, permit the Soo to invade territory it cannot at present serve, open up for the Soo a direct service to all Roseport industries and a new interchange with Rock Island, thus exposing GW's thirty-three industries along the thirteen mile route to solicitation by the Soo and other competing railways; (2) that the direct interchange with NW-GW at its Minneapolis yard would increase its annual net expenses by $186,000 and would require a capital expenditure of $255,000; (3) that the Chicago interchange would increase the NW-GW's expense by $31,000 per year; and (4) that the interchange with the Rock Island and Milwaukee at Minneapolis would substantially increase the NW-GW's annual expenses.

The Commission, after considering the record, the Examiner's recommendations, and the objections thereto, found:

" * * * [T]he merged company would probably be able to divert a significant amount of traffic from * * * the Soo Line. [*Somewhere between the $13,000 per year estimated by the applicants and $1,700,000 per year estimated by the Soo.*] * * * [T]he loss * * * would not be accompanied by a proportionate reduction in costs. * * * [I]t would not reduce the number of trains or switches, the motive power, crew, etc. As a result, the loss of net revenue would be disproportionately higher than the amount of traffic involved. * * * Considering the modest returns produced by the Soo operation [2.95% during period 1961–1964] and the widespread low-density expenses of a large part of its lines, * * * some conditions protective of the Soo Line should be imposed upon the merged company.

"In the States of Michigan and Wisconsin, Soo provides the only rail service at a number of points. It is important to the copper and iron mines and the forest industry in those states, where it operates more than 2,000 miles of road, much of it low-density branch line serving in the movement of the low-grade bulk commodities important to the economy of the territory. In terms of annual freight revenue per mile of road, Soo Line's average is lower than that of either applicant—$16,000 as compared to $20,000 for Great Western and $18,000 for the North Western.

"Notwithstanding its improving financial condition and its helpful corporate affiliation with a large, prosperous railroad, Soo Line, it must be remembered, is just now realizing the benefits of its own merger, [Footnote: Approved by this Commission in Duluth S. S. & A. R. Merger, 312 I.C.C. 341 (1960).] and, being of considerable value to the States in which it serves, it should not be undermined. We believe it important to the public interest that its facilities and services be sustained. Consequently, we are imposing conditions, short of the concessions recommended by the examiner (which, in some respects, we consider over-compensatory), but nevertheless sufficient to prevent undue erosion of Soo Line traffic under the increased competitive pressures of which the merged company would be capable."

*Report of the Commission*, at 44–46.

The Examiner's conditions, rejected by the Commission, related to the right of the Soo to serve industrial traffic at Roseport and to improved direct interchanges for the Soo at Minneapolis and Chicago. In rejecting these conditions, the Commission stated:

" * * * Contrary to the contention of the Soo Line (which openly seeks liquidated damages or at least their equivalent in operating concessions) section 5(2) (c) does not require applicants, as the price of their merger, to make restitution to their competitors. * * *

12. The Soo also objected to the Examiner's report on the grounds that the conditions imposed by the Examiner would only partially compensate it for its loss.

"In dealing with the requests of Soo Line and the other non-applicant carriers, we are, of course, concerned with relief for such carriers but our primary concern is with the public interest in transportation in the areas they serve. This involves, among other things, the admonition in section 5 (2) (c) requiring us to consider 'the effect of the proposed transaction upon adequate transportation service to the public' and 'the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory.' * * *

"Regarding inclusion, we consider that, to the extent the intervening railroads seek trackage rights and certain other concessions, some of which would require additional proceedings under section 5(2) to arrive at final terms, those railroads are, in effect, seeking inclusion. * * * From this point of view it can more readily be seen that request of intervening railroads for compensating concessions must be measured, no less than the applicants' proposal, by public interest criteria; and that it is not enough merely to say that, because an intervening railroad will be subject to some injury, it is entitled to restitution." [13]

Id. at 36–38.

13. The Commission in Great Northern, Pacific and Burlington Lines, Inc.— Merger, Etc.—Great Northern Railway Company, 331 I.C.C. 228 (1967), stated: " * * * In view of the public interest criteria of section 5(2) and the goals of the national transportation policy there is no question of our power to improve the position of carriers affected by a proposed merger. * * * " Id. at 280–81.
" * * * [In the prior report,] it was agreed that in any merger of the northern lines it would be necessary to include most but not all of the conditions that were sought by Milwaukee and North Western. * * * Applicants had opposed those conditions in the belief that they were not necessary * * * and that conditions to improve the position of applicants' competitors would be inappropriate in the section 5 proceeding. * * * " Id. at 280 (footnotes omitted).

It rejected the Roseport condition as being overcompensatory (worth $540,000 in operating revenues and $300,000 in net revenues each year), and as tending to discourage the future development of industrial parks. In lieu thereof, the Commission required that the NW-GW make available to the Soo on just and reasonable terms, traffic rights or some other economically operating arrangement for the purpose of serving its existing Roseport customer whose shipment of coke the Soo had heretofore handled in connection with the GW.

It rejected the West Minneapolis condition stating:

"Regarding Soo Line's request for direct interchange with the merged company at Minneapolis, we are requiring that the present interchange be continued via the intermediate services of the Minnesota Transfer Railway, Great Northern, Northern Pacific, or Railway Transfer, subject, however, to such other arrangements as the parties involved might agree upon, and our subsequent approval if required by law. * * * "

Id. at 52.

" * * * [A]s a result of applicants' reappraisal * * * [they] have agreed to accept all conditions that have been requested by the Milwaukee and North Western and considered appropriate by us. * * *
" * * * The effect of the Milwaukee and North Western conditions would be to strengthen the Milwaukee—both as to revenue potential and competitive posture." Id. at 281.
" * * * Giving effect to the additional protective conditions * * * [there would be] a net diversion to Milwaukee and North Western of more than $11.-6 million * * *." Id. at 279.
It is also of interest to note that in the *Pennsylvania-New York Central Railroad* merger proceeding, the Commission provided for a cash indemnification for the injured railway companies. 327 I.C.C. at 531–33.

It denied the other conditions requested by the Soo:

"All of the remaining conditions requested by the Soo Line, except No. 13, are denied. We are convinced that the protections we are affording the Soo through the conditions specified above are just and reasonable, will provide the means for preventing undue diversion of Soo Line traffic and for maintaining an adequate competitive balance, and are consistent with the public interest. The additional concessions sought by Soo would be, in the context of this case, overly compensatory and unwarranted by the record."

Ibid, (footnote omitted).

To summarize, the Commission accepted the Examiner's findings that the merger would divert traffic from the Soo, that the public interest required that the Soo be protected against the diversion, and that the NW-GW should arrange a direct interchange for the Soo with the Milwaukee and the Rock Island. It refused to accept the Examiner's findings with respect to the extent of the diversion, to the necessity of full or partial protection of the Soo against the diversion, and to the propriety of the Roseport and Minneapolis direct interchange conditions.

While the Commission is obligated to give weight to the findings of a Trial Examiner, it is not required to accept them. Similarly, were this Court primarily concerned with whether the Trial Examiner or the Commission had exercised the better judgment, we would have no choice but to accept the findings and conclusions of the Commission.[14] But this is not the choice we face. We must determine whether the findings of the Commission are adequate, whether they are supported by substantial evidence,[15] and whether they are in accordance with the law.

In our view, the findings relating to the diversion are not adequate. The range of possible diversion was too broad and the Commission made inadequate findings as to the extent to which diversion would impair the Soo's ability to serve the public. There is a "lack of the basic or essential findings required to

14. "The final distillation from the case law is that the primary fact-finder is the agency, not the examiner; that the agency retains 'the power of ruling on facts . . . in the first instance'; that the agency still has 'all the powers which it would have in making the initial decision'; that the examiner is a subordinate whose findings do not have the weight of the findings of a district judge; that the relation between examiner and agency is not the same as or even closely similar to the relation between agency and reviewing court; that the examiner's findings are nevertheless to be taken into account by the reviewing court and given special weight when they depend upon demeanor of witnesses; and that the examiner's findings probably have greater weight than they did before adoption of the APA." Davis, Administrative Law, Vol. II, § 10.04 (1958); F.C.C. v. Allentown Broadcasting Corp., 349 U.S. 358, 75 S.Ct. 855, 99 L.Ed. 1147 (1955); Universal Camera Corp. v. National L. R. Bd., 340 U.S. 474, 71 S.Ct. 4, 56, 95 L.Ed. 456 (1951); cf., In re United Corporation, 249 F.2d 168 (3d Cir. 1957).

15. The evidentiary standard to be applied is that of "substantial evidence," Ill. Cent. R. Co. v. Norfolk & Western R. Co., 385 U.S. 57, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966): "Substantial evidence is 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.'" Id. at 66, 87 S.Ct. at 260. Accord: Motor Truck Supply Co. v. United States, 238 F.Supp. 645 (D.C.D.Minn.1965); Great Northern Railway Company v. United States, 209 F.Supp. 230 (D.C.D.Minn. 1962); Great Northern Railway Company v. United States, 172 F.Supp. 705 (D.C.D.Minn.1959), reversed as moot 362 U.S. 939, 80 S.Ct. 804, 4 L.Ed.2d 768 (1962); Quickie Transport Company v. United States, 169 F.Supp. 826 (D.C. D.Minn.), aff'd per curiam 361 U.S. 36, 80 S.Ct. 140, 4 L.Ed.2d 111 (1959); Minneapolis & St. Louis Ry. Co. v. United States, 165 F.Supp. 893 (D.C.D.Minn. 1958) (per curiam), aff'd 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959); Canadian Pacific Railway Co. v. United States, 158 F.Supp. 248 (D.C.D.Minn. 1958).

support the Commission's order." State of Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 125, 75 L.Ed. 219 (1931). Accord, Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); Colorado-Wyoming Gas Co. v. Federal P. Com., 324 U.S. 626, 65 S.Ct. 850, 9 L.Ed. 1235 (1945); Atchison, T. & S. F. R. Co. v. United States, 295 U.S. 193, 55 S.Ct. 748, 79 L.Ed. 1382 (1935); United States v. State of Louisiana, 290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 181 (1933); Manufacturers R. Co. v. United States, 246 U.S. 457, 38 S.Ct. 383, 62 L.Ed. 831 (1918); Meeker v. Lehigh Valley R. Co., 236 U.S. 412, 35 S.Ct. 328, 59 L.Ed. 644 (1915).

Its finding that the traffic diversion from the Soo would be "somewhere between the [$13,000 per year] estimate of the applicants and [the $1,700,000 estimate] of the Soo," in our view, amounts to no finding at all.[16] Such is particularly the case when the Commission itself concedes that the Soo's present return on investment is a modest one and would be substantially affected by a reduction in gross revenue. If the diversion approached the higher amount, the Soo's net income (averaging 3.1% per year in the period 1961–64) would be reduced by nearly 29%,[17] and its return on investment would be reduced by approximately 31%, or from 2.95% to 1.90%.[18] On the other hand, if the diversion were near the

16. In Broth. of Maint. of Way Employees v. United States, 221 F.Supp. 19 (D.C. E.D.Mich.), aff'd without opinion 375 U.S. 216, 84 S.Ct. 341, 11 L.Ed.2d 270 (1963), the argument was advanced that the Commission ought to have made a specific finding as to the percentage of diversion. This contention was rejected. A review of the Commission's opinion reveals that the findings in that case were probably adequate. Unlike these proceedings, the diversion estimates of the railroads were specifically negated by the Commission. Chesapeake & O. Ry. Co.—Control—Baltimore & O. R. Co., 317 I.C.C. 281–83 (1962). Reading the Commission's opinion as a whole, the conclusion of the Commission is that only a de minimus amount of traffic will be diverted—not at all approaching the estimates of Central. In contrast, the Commission in the NW–GW proceeding did not negate the estimates of the Soo but rather indicated that the diversion would be "substantial."

Also of significance in the *Broth. of Maint. of Way* case is the fact that prior to the Commission's opinion, the competing railroads had withdrawn their objections to the merger. While labor interests probably had standing to question the adequacy of the diversion findings, the Court may well have been influenced by the fact that the allegedly injured railroads were no longer objecting.

17. In the *Northern Lines* and *Penn.-Central* merger proceedings, the Commission stated that it considered a rate of return ranging from 2% to 3.73% (331 I.C.C. at 261) and from 2.88% to 4.43% (327 I.C.C. at 499) to be lower than necessary to improve railway service, provide jobs for employees, and discharge transportation obligations to the public. It compared this return with that from Government Bonds of 4.95% and with the average rate of return of Class I railroads in the United States in 1965, and 1966 of 3.69% and 3.9%.

18. The following chart, prepared by the Soo and not challenged by the Commission, indicates the effect of a $1.7 million diversion in each of the years shown:

| Year | Actual | | Adjusted for NW–GW Merger | |
|---|---|---|---|---|
| | Net Income | Return on Investment | Net Income | Return on Investment |
| 1961 | $ 664,000 | 1.53% | ($ 671,000) | .98% |
| 1962 | $3,100,000 | 2.45% | $1,765,000 | 1.88% |
| 1963 | $4,096,000 | 2.90% | $2,761,000 | 2.31% |
| 1964 | $4,355,000 | 3.03% | $3,020,000 | 2.44% |

While the net income of the Soo exceeded $5 million in 1965 and 1966, it was less than $900,000 for the first eight months of 1967.

lower amount, the reduction in its net income and return on investment would be nil.

■ We fully understand that the task of the Commission in determining potential diversion is a difficult and complex one, and that future events may prove that the Commission's findings were wide of the mark. But the very fact that these are difficult and complex matters makes it all the more necessary for the Commission to use its expertise, but use it, it must.

Had the Commission found that the Soo could continue to effectively serve the public even if the diversion reached the higher limits and its return on investment might be as low as 1.90%, we would have another matter, but it did not do so.

We recognize that there are factors other than return on net income which may make it possible for a railway to continue to provide adequate service to the public, even if its rate of return is comparatively low. The only such factor that the Commission suggests is that the Canadian Pacific Railway Company owns 56% of Soo's stock. It indicates that

the parent could, in the future, be expected to provide financial support for its subsidiary if it got into difficulty.

In the light of numerous court decisions dealing with the obligation of a railway to continue to operate unprofitable portions of its business,[19] we view with some skepticism the possibility that the Canadian Pacific would be required to subsidize unprofitable operations of the Soo over an extensive period of time. Furthermore, the unprofitable operations would very likely be in the sparsely populated areas the Commission deems most important to protect.

Counsel for the Commission urged, at oral argument, that the Commission had not attempted to determine the extent of the expected diversion, anticipating that the Soo could seek to have additional conditions imposed on the NW-GW, including those heretofore denied by the Commission if the diversion was substantially in excess of $13,000 per year.[20] The difficulty with the Commission's argument is that the condition retaining jurisdiction is interpreted by NW's counsel as precluding a reconsideration of the conditions initially denied by the Commission.[21] Furthermore, it might well be

---

19. State of Colorado v. United States, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878 (1926) (the Court balanced the degree of detriment to the community directly affected with the financial loss to the railway); Village of Candor v. United States, 151 F.Supp. 889 (D.C.N.D.N.Y.1957) (showing by individual shippers that they were financially disadvantaged by the discontinuance insufficient to show error); United States Feldspar Corporation v. United States, 38 F.2d 91 (D.C. N.D.N.Y.1930); and of a parent to support unprofitable operations of a subsidiary, Town of Inlet v. New York Cent. R. Co., 7 F.Supp. 781 (D.C.N.D.N.Y. 1934) (held not error for Commission to disregard the financial condition of parent whose wholly owned subsidiary was permitted to discontinue an unprofitable run); Jay Street Connecting Railroad v. United States, 174 F.Supp. 609 (D.C. E.D.N.Y.1959).

20. "JUDGE HEANEY: * * * [I]f Soo Line believed and were able to establish that in fact the diversion that had occurred were substantially in effect [ex-

cess] of those or were substantially equal to what it contended before the original hearing that it would not be estopped by any of the present findings of the Interstate Commerce Commission from coming back in and saying 'You see, we are right, that we have $1,300,000 in traffic that has been diverted for us— from us, rather—and that therefore we seek to, and that we can't exist with that kind of a diversion, we can't meet our needs to the public. We want additional relief.' There would be nothing about the original proceeding that would prevent them from proceeding on that basis? "MR. RUSH: Judge Heaney, that is our interpretation. That was the intention of the Commission in reserving jurisdiction as broadly as it did."

21. "MR. WHEELER: * * * In our opinion the Commission was not saying that the Soo Line had a carte blanche to come in at any time later and retry this entire case. The Commission did say that if specific conditions were ineffective, Soo Line could return to make a showing that those conditions were in-

argued that if the diversion were less than the $1,700,000 estimated by the Soo, it would not exceed the amount expected by the Commission, and thus there could be no reconsideration.

While conditions of this type serve a useful purpose in protecting against the unexpected, they cannot serve as a substitute for adequate initial findings where the issue has been fully submitted to the Commission. Compare, Penn-Central and N.W. Inclusion Cases, supra, at 389 U.S. 486, 88 S.Ct. 602, in which the Supreme Court authorized the Reading Railroad to institute proceedings based on actual experience to obtain relief from undue prejudice caused by the merger.

We now turn to the question as to whether the Commission's findings and conclusions with respect to the Roseport conditions are supported by substantial evidence and based on proper standards.

In finding that the Roseport condition was "overcompensatory," the Commission relied on the Examiner's report:

"Since the examiner has concluded that the threat to Soo on its Roseport traffic is real, an additional condition will be imposed requiring the merged company to negotiate and agree to permit Soo to serve Roseport industry directly over the tracks of C.G.W. While admittedly this would tend to overcompensate Soo in terms of traffic originating or terminating at Roseport as against loss of present traffic moving from this point, the examiner does not believe that any lesser condition would suffice. * * *"

Report of the Examiner, at 101 footnote omitted).

We believe the reliance to be misplaced.

It is clear from the above, as well as from a careful study of the record, that the Examiner used the term "overcompensate" in the sense that the Soo would realize greater revenue from Roseport traffic in the future than the past, and that this would compensate it for other losses in the system. He stated:

"Overall, it is the examiner's conclusion that the conditions imposed * * will leave Soo in as relatively good a competitive position as before merger. While it may lose a small portion of its present traffic, particularly cars originating or terminating at C.G.W. local points or presently moving via a Soo/C.G.W. route due to loss of C.G.W. solicitation efforts, conditions imposed by the examiner * * * should significantly increase Soo's competitive access to industry which heretofore was not feasible. * * * "

Id. at 102.

Nor are we impressed with the Commission's argument that the Roseport condition would discourage the growth and development of industrial parks. There is nothing in the record to support the assertion of the Commission that a railroad, contemplating the development of an industrial park, gives any consideration to the possibility that at some time in the future, it may merge with a competitive railroad, and that when it does so, it will be required to open the park to its competitors.

The Commission appears to argue that it would be improper, as a matter of law, to give the Soo access to Roseport because to do so would permit the Soo to share in the fruits of GW's investment. We cannot agree. The condition is similar to the one imposed by the Commission in the "Northern Lines case," granting the Milwaukee entrance to Portland, Oregon. Great Northern, Pacific and Burlington Lines, Inc.—Merger, Etc.—Great Northern Railway Company, supra, at 280. There, the Commission insisted on the condition even though the Union Western Pacific Railway Company contended that the condition would permit the Milwaukee to share in the fruits of its investment.

effective and ought to be strengthened. " * * * Soo would seek a wide opening just as here it wanted to try the Milwaukee as well as the Great Western case. We would try to narrow any reopened proceedings, just as here we wanted to try the Great Western case only."

## CONCLUSION

■ It is the responsibility of the Commission to determine, as precisely as its expertise will permit, the extent to which the NW-GW will divert traffic from the Soo and the extent to which the public interest requires that the Soo be protected against this diversion. After having done this, the Commission must determine the conditions that it will impose to give the necessary protection. These conditions should be as definite as practicable and leave as little to future negotiation between the parties as feasible.

We recognize the difficulty in making these determinations and the natural inclination to escape them by avoiding specific findings and leaving as many issues to negotiation between the parties as possible. When this is done, however, effective judicial review is impossible.

■ There remains the question as to whether the merger should be permitted to proceed pending further action by the Commission. We do not believe that it should. In view of the lengthy hearings that have heretofore been conducted, there is no reason why the Commission can not expedite any proceedings that it may consider to be necessary to reach a decision consistent with this opinion. It is the request of this Court that it do so, and that the parties give the Commission their full cooperation in so doing.

## III. LABOR PROTECTIVE CONDITIONS FOR THE SOO EMPLOYEES.

Labor contended, before the Commission, that § 5(2) (f) extends protection to all employees adversely affected by a merger, including the employees of a nonapplicant. At the outset, we make it clear that this decision is limited to employees of the Soo, who alone claim to be adversely affected. Section 5(2) (f) provides:

"As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order."

The Commission rejected this contention on the ground that, as a matter of law, this section does not apply to the employees of the Soo.[22] It added:

"Further, there is no credible evidence of record showing that any employees of nonapplicant railroads would be adversely affected as a direct result of the merger."

Report of the Commission, at 66.

The Commission cites Florida East Coast Railway Co. v. United States, 259 F.Supp. 993 (D.C.M.D.Fla.1966), dismissed as moot sub nom., 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285 (1967), to support its position. Cf., Louisville & Nashville R. Co. v. United States, 244 F.Supp. 337 (D.C.W.D.Ky.1965), aff'd per curiam 383 U.S. 102, 86 S.Ct. 716,

---

22. The Commission stated:
"The labor associations contend that section 5(2) (f) extends to all employees adversely affected, including those of the nonapplicant Soo Line and others. Similar argument has been repeatedly rejected in prior cases [Footnote: See, e.g., Baltimore & Ohio Railroad Co. Operation, 261 I.C.C. 615, Seaboard Air Line R. Co. Control, 312 I.C.C. 507.] on grounds which we find entirely valid and pertinent here. * * *"
Report of the Commission, at 65.

15 L.Ed.2d 615 (1966); Railway Labor Executives' Association v. United States, 226 F.Supp. 521 (D.C.E.D.Va.1964), vacated 379 U.S. 199, 85 S.Ct. 307, 13 L.Ed.2d 338 (1964).

The Commission does not acknowledge the contrary holding in Railway Labor Executives' Association v. United States, 216 F.Supp. 101 (D.C.E.D.Va.1963). In that case, the Court stated:

> "Section 5(2) (f) commands protection of 'employees affected' by the 'transaction'. The 'transaction' here is the acquisition by Seaboard of the use of Broad Street station. *The Act does not, as the Commission would say, limit its security to employees of a carrier involved in the transaction.* The guardianship is not dependent upon the role of their employer in the transaction. All 'employees affected' are under the aegis of the Act. The only question is whether they are 'affected': Are they touched sufficiently by the transaction? * * *" (Emphasis added.)

Id. at 102.

The initial sentence of § 5(2) (f) admits no ambiguity: " * * * [T]he Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected." To be protected, the employee need only fulfill two requirements: he must be a railroad employee and he must be affected by the merger.[23]

The District Court, in the *Florida East Coast* case, reached a contrary interpretation of § 5(2) (f) stating that when that subsection was considered in the context of other related provisions of § 5 (2),[24] such a result was required:

> " * * * Taken in context, the provision is but one of many dealing with the Commission's treatment of merger *applicants*. When Congress spoke of '*carriers*' in section 5(2), it referred to the *participants*. For example, in section 5(2) (a) (i) the statute required ICC approval for 'two or more carriers to consolidate or merge.' In section 5(2) (c) the statute speaks of the 'interest of the carrier employees affected,' obviously meaning participating carrier. And when Congress wished to refer to nonparticipating carriers in 5(2) (d), it said 'another railroad or other railroads.' Taken in context, we think it clear that the 'carrier or carriers' referred to in section 5(2) (f) are the carriers involved in the merger and most immediately affected by the Commission's action. * * *" (Emphasis added.)

259 F.Supp. at 1019.

---

**23.** A recent comment of Mr. Justice Black, while dealing with another statute, is pertinent: "The language of these sections could not, I think, raise doubts about their meaning except to someone anxious to find doubts.' Prima Paint Corp. v. Flood & Concklin, 388 U.S. 395, 87 S.Ct. 1801, 1810, 18 L.Ed.2d 1270, 1282 (1967) (dissenting opinion).

**24.** "(2) *Unifications, mergers, and acquisitions of control.*

"(a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph—

"(i) for two or more carriers to consolidate or merge their properties or franchises, * * * into one corporation * * *

   *  *    *  *    *

"(c) In passing upon any proposed transaction under the provisions of this paragraph, the Commission shall give weight to the following considerations, among others: (1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected.

"(d) The Commission shall have authority in the case of a proposed transaction under this paragraph involving a railroad or railroads, as a prerequisite to its approval of the proposed transaction, to require, upon equitable terms, the inclusion of another railroad or other railroads in the territory involved, upon petition by such railroad or railroads requesting such inclusion, and upon a finding that such inclusion is consistent with the public interest." 49 U.S.C. § 5 (1964).

We refuse to follow *Florida East Coast* in this case. The decision of the District Court in that case is based, first, on the questionable conclusion that "carrier" means "participant" and, second, on the inexplicable assertion that "participant" means "applicant." Moreover, even assuming that "carrier" means "participant," Soo, by the Commission's own analysis in these proceedings, is a "participant."

We disagree with the District Court's conclusion that "carrier," as used in the context of § 5(2), means "participant." This is contrary to the Act itself which provides in § 5(13):

> "As used in paragraphs (2)–(12) of this section, inclusive, the term 'carrier' means a carrier by railroad * * subject to this chapter; and a motor carrier subject to chapter 8 of this title; and a water carrier subject to chapter 12 of this title."

Thus, the qualification the Court seeks to impose on "carrier," as used in § 5(2), is not consistent with the definitional clause in the very same section. Section 5(13) demonstrates that the term "carrier," in § 5(2) (a) (i), is broader than the term "carrier or carriers by railroad" that appears in § 5(2) (f). The former includes "motor" and "water" as well as "railroad carriers." The gravest error in the District Court's reasoning is illustrated by their following assertion: "In section 5(2) (c), the statute speaks of the 'interest of the carrier employees affected,' *obviously* meaning participating carrier." (Emphasis added.) That qualification, or "obvious meaning," is nothing more than an undisguised statement of the conclusion.

A comparison of the first two sentences of the statutory analysis in *Florida East Coast* shows that the Court is equating "applicant" with "participant." This assumption was not explained, and we believe it to be incorrect.

Quite simply, a carrier may be a participant in the merger transaction without being an "applicant." This is demonstrated by the Commission's own analysis. In the present proceeding, the Commission observed: " * * * to the extent the intervening railroads seek trackage rights and certain other concessions, * * * those railroads are, in effect, seeking inclusion." The Commission continued: "From this point of view it can more readily be seen that request of intervening railroads for compensating concessions must be measured, no less than the applicants' proposal, by public interest criteria * * *." Report of the Commission, at 37–38. This last comment was a reference to § 5(2) (c) (2) which requires the Commission to consider "the effect upon the public interest of the *inclusion*, or failure to include, other railroads in the territory involved in the proposed transaction." (Emphasis added.)

Section 5(2) (f) may itself be analyzed along the same line of reasoning. We note that the first portion of the first sentence of that section states the following: "As a condition of its approval, under this paragraph, of *any transaction involving a carrier or carriers by railroad * * *.*" (Emphasis added.) "Carrier or carriers by railroad" is the referent of the last portion of the same sentence: "*the* railroad employees"; and it is the referent of subsequent clauses in that section: "*the* carrier or carriers by railroad"; "*such* carrier or carriers." While it could well be argued that any carrier who is affected by the merger is "involved" in the "transaction," at the very least, Soo is "involved" given the fact that it requested the protective conditions it did in this case. Again, this is based on the Commission's own statement that "to the extent the intervening railroads seek trackage rights * * * those railroads are, in effect, seeking inclusion."

Even if it be admitted that the language in § 5(2) (f) is ambiguous, the public policy on which that section is based leads to the conclusion that employees of applicants and protected railroads alike are to be protected from the effects of the merger. Recently, the Commission itself has spoken on the matter of em-

ployee protective conditions as provided by § 5:

" * * * The terms of section 5, particularly section 5(2) (c) and (f), implicitly recognize that the working conditions and morale of rail employees are important elements to the maintenance and preservation of an efficient and economical transportation system. * * * "

Chesapeake-O. Ry. Co.—Control—Western Maryland Ry. Co., 328 I.C.C. 684 (1967). This policy admits no distinction between the employees of applicants or protected railroads.[25] Furthermore, protective conditions are extended to the Soo because it is in the public interest to maintain it as a viable railroad. How then can it be contended that it is not as important to protect its employees whose working conditions and morale the Commission itself recognizes as a vital factor in our transportation system?

Counsel for the Commission argues before this Court that the Commission held that it was permitted, but not required, to extend protection to employees of the Soo and, therefore, the Commission is not required to extend protection. The only question is whether the Commission abused its discretion in refusing to extend that coverage. We disagree.

The Commission's language clearly and unequivocally states that § 5(2) (f) does not extend to employees of the Soo even though they may be affected:

"The labor associations contend that section 5(2) (f) extends to all employees adversely affected, including those of the nonapplicant Soo Line and others. Similar argument has been re-

peatedly rejected in prior cases on grounds which we find entirely valid and pertinent here. * * * " (footnote omitted, see our Footnote 22, supra.)

Report of the Commission, at 65.

Furthermore, the Commission's past practice indicates that it considers itself without authority to protect third-party employees. In Southern Railway Co.—Control—Central of Georgia Ry. Co., 317 I.C.C. 557, 567–68 (1962), the Commission stated:[26]

"Assuming that we have the power to impose conditions for the protection of employees of carriers not directly involved in a transaction before us, in our opinion, it would be inequitable and contrary to the public interest for us to do so in situations like that presented here. * * * "

We turn now to the Commission's conclusion that "there was no credible evidence of record showing that any employees of nonapplicant railroads would be adversely affected as a direct result of the merger." This conclusion was apparently based on the following finding:

" * * * The associations refer to a dialogue in which it was estimated that, on the basis of a rule-of-thumb, labor expenses are 60 percent of total expenses, and that by applying that formula to the Soo Line's diversion estimate, the loss of traffic would reduce labor expenses by $780,000 per year, equivalent to the wages of 110 employees. This line of evidence was inconsistent with the Soo Line's persistent claims that a diversion of $1.7 million in gross revenue would result

25. In the cited proceedings, the precise issue involved related only to employees of applicants.

26. In a preliminary draft of the Commission's decision in these proceedings, they relied on the *Southern-Central* case:
" * * * Concerning the scope of 'railroad employees affected' as the term is used in section 5(2) (f), we hereby adopt our rationable [sic] and conclusion on this point as stated in *Southern-Central* * * * ."

At one point in this proceeding, the preliminary draft was issued and printed as the decision of the Commission, 330 I.C.C. 13 (See p. 54), but was subsequently withdrawn. NOTICE By The Secretary Of The Interstate Commerce Commission, November 15, 1967: "The pamphlet report * * * contains substantial typographical errors which occurred during printing * * * ."

in a net revenue loss of $1.3 million and that the reduction in expenses would range about $400,000. It was the Soo Line's further contention that the total diversion would be insignificant in terms of reducing the number of trains, switchings and other operations. The logical inference is that few, if any, Soo Line employees would be laid off, even if the diversion claims were substantiated."

Report of the Commission, at 66.

We cannot, as the Commission suggests, draw the inference that few, if any, of the Soo's employees would be laid off even if the diversion claims were substantiated. Indeed, a contrary inference is the only one that we can draw from the testimony. A careful reading of the testimony from which the Commission states it drew its inference shows that the witness made it clear that the Soo

claimed and expected a $1.7 million diversion and that of that amount, $400,000 would not adversely affect Soo or its employees because it represented payments by the Soo to carriers who performed switching services in connection with the diverted work. The further and uncontradicted testimony of this witness was that the Soo would reduce its expenses by the extent of its net revenue $1.3 million, that the reductions would be in maintenance of equipment and right-of-way expense, and that the Soo employees would bear 60% of the loss.[27]

The Examiner did not reach this problem because he recommended conditions which he believed would provide the Soo with other traffic sufficient to fully offset the traffic diverted to the NW–GW. In such event, the Soo's revenue would be unaffected by the merger; and as the extent of injury to the Soo employees

27. "Q (By Mr. Hickey) Mr. Klingel, do you recall the testimony of the previous witness, Mr. Sherwood, to the effect that he had estimated that operations of the merged or unified company would result in the diversion of approximately $1,700,000 in annual freight revenues now enjoyed by the Soo?
"A I do.
"Q Do you further recall the testimony of previous witness Slater to the effect that there might be an offset to this estimated loss in the approximate amount of $400,000 annually to be accomplished by a reduction in expenses of switching and per diem charges, thus leaving about $1,300,000 in a net loss of gross revenue?
"A I do.
"Q Assuming that the operations of the Soo in the first full year following merger of the two applicants is at the same level as they were in 1964, do you believe, in your capacity, that the Soo could reduce its expenses by the amount of $1,-300,000 do [sic] as to enjoy the same net revenue that it enjoyed in 1964?
"A Yes, we could reduce expenses. We would have to reduce expenses as our gross dropped.
"Q If you were successful in effecting these reductions, could you describe in what items there could occur such savings or reductions in expenses?
"A These savings would be entirely independent of the traffic lost. They would not flow because cars had been diverted.

They would be savings, or arbitrary cuts that would be made in expenses so as to keep expenses in line with revenues, and would represent reductions in maintenance of way expenses, in maintenance of equipment expenses.
"Q Would you estimate what proportion of such reductions would flow as a result of reduced payroll expenses—labor payroll?
"A Our labor expense, including direct wages, and fringe benefits, are approximately 60 percent of total expense, so it would be approximately $780,000 that would be a labor expense reduction.
"Q Could you translate that for us into the number of job displacements or abolishments that would be reflected by this $700,000-plus?
 *       *       *       *       *
"The Witness: Using an average annual wage expense of $7,000 per employee, that would represent about 110 employees who would be laid off.
"Q (By Mr. Hickey) That $7,000 annual per employee is a reasonable average?
"A Yes.
"Q Does it follow this estimate of resulting net loss in revenue is on the low side, that an attempt would be made to make a further reduction in these same items you described?
"A Yes. If our loss in gross revenue is greater than anticipated, the expense reduction will be greater than as outlined here."

was established only by testimony to the effect that the employees would have to absorb 60% of the Soo's loss, no protective conditions were necessary for the Soo employees.

It may be that the Commission on remand will impose conditions which it believes will fully offset the traffic diverted to NW-GW, and which it believes will protect the Soo employees against job loss. If so, no injury to them will result and no protective conditions will be necessary. If it finds, however, that employees of the Soo will be directly and adversely affected by the merger, it must impose protective conditions for their benefit.

DEVITT, Chief Judge (dissenting).

In my view, the Interstate Commerce Commission reached a permissible conclusion within the law in approving, as it did, the merger of the Chicago North Western and the Chicago Great Western Railways and we should dismiss the complaint.

The heart of the position taken by my associates in the majority opinion is that the Commission made a mistake in approving a plan which did not provide more of the requested conditions to protect the continued well-being of the competing Soo Line as a result of the merger.

But it must be remembered that the test in matters of this kind is not whether the Commission acted wisely and well, but whether it acted within its authority on the record before it. To view it otherwise would be to vest the court with the power to substitute its judgment for that of the Commission. Clearly, the judiciary does not have that power. We have many times disavowed it. Great Northern Ry. Co. v. United States, 209 F.Supp. 230, 232 (D.C.1960); Great Northern Ry. v. United States, 172 F.Supp. 705 (D.Minn.1959); Quickie Transport Co. v. United States, 169 F.Supp. 826 (D. Minn.1959); Minneapolis & St. Louis Ry. v. United States, 165 F.Supp. 893 (D. Minn.1958); Canadian Pacific Ry. v. United States, 158 F.Supp. 248 (D.Minn.

1958); Schaffer v. United States, 139 F.Supp. 444, 448 (D.S.D.1956), reversed on other grounds, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957).

The United States Supreme Court has repeatedly told us of our very limited duty in this respect, e. g., Ill. Cent. R. Co. v. Norfolk & Western R. Co., 385 U.S. 57, 66, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 516, 66 S.Ct. 687, 90 L.Ed. 821 (1946), and the Congress has specifically confined our judicial review responsibility to determining whether there is substantial evidence in the record to support the administrative action taken. Administrative Procedure Act, 5 U.S.C.A. § 1009 (e) (5).

An examination of the record in the light of the contentions made by the parties leaves the clear impression with me that the Commission exercised a permissible discretion within the law in approving the merger with the conditions which it attached.

There really isn't any dispute as to the propriety, or, for that matter, the wisdom, of the action of the Commission in authorizing the merger. The principal argument urged is that the Commission did not impose all of the conditions requested by the Soo or, in the view of the majority, at least all of the conditions recommended by the Examiner. But the number and kind of conditions to be attached is a question of judgment for the Commission to determine. The Examiner was only an agent of the Commission in taking testimony and making recommendations. His findings are not controlling on the Commission. While apparently favoring merger with the conditions recommended by the Examiner, but opposing it with the conditions imposed by the Commission, the majority, nevertheless, does seem to recognize that it is the judgment of the Commission and not the Examiner which controls. And that, of course, is the law. The "clearly erroneous rule" is not applicable to the findings and recommendations of a Hearing Examiner. F.C.C. v. Allentown, 349

U.S. 358, 364, 75 S.Ct. 855, 99 L.Ed. 1147 (1955).

My confreres find fault with the Commission for not determining with exactness the amount of financial loss the Soo will suffer as a result of the merger, and hence reason that absent such specific finding the Commission could not properly determine the compensatory conditions to impose. But exact precision in this regard is not required—indeed, probably would be impossible. I dare say that an exact approximation of the amount of traffic loss probably to be suffered by the Soo because of diversion of traffic occasioned by the merger would be no more than a guess. As the United States District Court for the Eastern District of Michigan said in answer to a similar contention:

" * * * The Commission was not required to engage in speculation and guesswork to come up with a precise percentage prediction."

Brotherhood of Maintenance of Way Employees v. United States, 221 F.Supp 19, 25 affirmed per curiam 375 U.S. 216, 84 S.Ct. 341, 11 L.Ed.2d 270.

Indeed, the Commission did make an adequate finding supportive of its action in imposing the conditions it did when it said:

" * * * We are convinced that the protections we are affording the Soo through the conditions specified above are just and reasonable, will provide the means for preventing undue diversion of Soo Line traffic, and for maintaining an adequate competitive balance, and are consistent with the public interest. The additional concessions sought by Soo would be, in the context of this case, overly compensatory by the railroad."

(p. 25 of Commission's Decision)

This judgment of the Commission was an exercise of the expertise which the Supreme Court of the United States long has recognized it possesses:

"Forecasting the future ability and desire of railroads to effect diversion is peculiarly a matter for the expert judgment of the 'tribunal appointed by law and informed by experience.' Illinois Central R.R. v. I.C.C., 206 U.S. 441, 454, 27 S.Ct. 700, 704, 51 L.Ed. 1128 (1907)."

Erie Lackawanna R. Co. v. United States, 279 F.Supp. 316 (S.D.N.Y.) 1967.

We cannot outguess the Commission in predicting the future effects of the merger. The United States District Court for the Middle District of Florida recently said it succinctly:

"The Commission, and not we, must tailor the protection to fit its expert prediction of the future * * * when not plainly unreasonable, we must leave to the agency vested with congressionally assumed expertise this type of decision. * * *

Florida East Coast Ry. v. United States, 259 F.Supp. 993 (M.D.Fla.1966) affirmed per curiam, 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285 (1967).

As recently as January 15, 1968 the United States Supreme Court reaffirmed this principle when it said:

"These are matters as to which reasonable men may reasonably differ in detail, and we see no basis for setting aside the Commission's conclusions * * *. *We are no more competent than the Commission * * * to ascertain the accuracy of those predictions.*" [Emphasis supplied.]

Penn-Central Merger and N. & W. Inclusion cases, 389 U.S. 486, 524, 88 S.Ct. 602, 621, 19 L.Ed.2d 723, dated January 15, 1968.

The majority also disagree with the Commission in not providing labor protective conditions for the Soo employees who might suffer as a result of the merger.

But the plain fact of the matter is that whether or not the Commission has

the legal authority to impose conditions for the benefit of employees of non-applicant carriers, it did not do so in this case because it found no factual justification for doing so. The Commission held that there was

" * * * no credible evidence of record showing that any employees of non-applicant railroad would be adversely affected as a direct result of the merger."

(p. 55 of Commission's Decision.)

This finding is supported by the record and apparently was based, in part at least, on the evidence and contentions of the Soo before the Examiner that in its efforts to minimize the claimed 1.7 million-dollar traffic loss there would be no reduction of the labor force but only a reduction of such costs as those for fuel and for per diem, switching, and interchange charges by other railroads.

In my view the conclusion of the Commission that, on the record before it, no labor conditions for the benefit of Soo employees need be imposed was a reasonable one.

In connection with our appraisal of the reasonableness of the Commission's action in approving merger with the conditions it prescribed, it should be emphasized that the Commission wisely retained continuing jurisdiction to modify the conditions imposed as experience under the merger might require. Thus Condition No. 6 of the Conditions for the Protection of Carriers Generally, contained in Appendix VI to the Report provides that:

"Any party or any person having an interest in the subject matter may, at any future time, make application for such modification of the above conditions, or any of them, as may be required in the public interest and jurisdiction will be retained by this

Commission to reopen the proceedings on our own motion for the same purpose."

In its Order of April 20, 1967 approving the merger, the Commission also specifically provided for the retention of jurisdiction to make further orders as might be appropriate or necessary.

The inclusion of similar reservations of jurisdiction in the *Penn-Central* case apparently was an important factor considered by the United States Supreme Court in weighing the reasonableness of the ICC action in those cases. Penn-Central Merger and N. W. Inclusion cases, supra, 389 U.S. at pp. 513, 514, 88 S.Ct. at p. 616, 19 L.Ed.2d 723.

But even if it be assumed that the Commission made a mistake of judgment in approving the merger with the attached conditions, as has been decided by the majority, it does not follow that we can correct that mistake of judgment; for as wisely and authoritatively said by another court at another time, " * * * the power of * * * an administrative board to decide questions is not confined to deciding them correctly." Pittsburgh Plate Glass Co. v. N.L.R.B., 113 F.2d 698, 701 (8th Cir. 1940).

The Commission, with propriety, might have imposed all of the Soo's 14 requested conditions, or it might have imposed some of them, or it might have imposed those which the Examiner recommended; but it chose, in the exercise of its discretion, to impose the six particular conditions which it did. I think that was a permissible conclusion on the whole record before it—neither arbitrary or unreasonable—made within the specific authority assigned to it by the Congress and one, therefore, which we cannot disturb. Minneapolis & St. Louis Ry. v. United States, 165 F.Supp. 893, 901.

We should dismiss the complaint.