UNITED STATES v. ATLANTA TERMINAL CO. *

(Circuit Court of Appeals, Fifth Circuit. October 15, 1919.)

No. 3417.

COMMERCE &27(2)—MASTER AND SERVANT &13—TERMINAL COMPANY SUBJECT TO HOURS OF SERVICE ACT—"INTERSTATE COMMERCE."

    A terminal company, incorporated as a railroad company, which owned a terminal passenger station and the tracks leading thereto, used by various interstate railroads, which sold tickets and checked and loaded baggage for their trains, maintained a telegraph office through which their train orders were transmitted, operated all switches to and from its tracks, and through its station master directed the movements of all trains while on such tracks, *held* a common carrier engaged in transportation of passengers and baggage by railroad in interstate commerce, and subject to the provisions of the Hours of Service Act March 4, 1907 (Comp. St. §§ 8677–8680), as respects its telegraph operator, who transmitted the train orders.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

In Error to the District Court of the United States for the Northern District of Georgia; William T. Newman, Judge.

Suit for penalty by the United States against the Atlanta Terminal Company. Judgment for defendant, and the United States brings error. Reversed.

Hooper Alexander, U. S. Atty., and John W. Henley, Asst. U. S. Atty., both of Atlanta, Ga., and Stacy H. Myers, Sp. Asst. U. S. Atty., of Washington, D. C.

Albert Howell, Jr., and Arthur Heyman, both of Atlanta, Ga., for defendant in error.

Before WALKER, Circuit Judge, and FOSTER and GRUBB, District Judges.

GRUBB, District Judge. This was a civil suit brought by the plaintiff in error for the recovery of a penalty for an alleged violation of Hours of Service Act March 4, 1907, c. 2939, 34 Stat. 1415, 1416 (Comp. St. §§ 8677–8680). The District Judge directed a verdict for the defendant (defendant in error), and from the judgment entered thereon, the plaintiff (plaintiff in error) has sued out this writ of error. It is conceded that, if the defendant was a common carrier within the meaning of the Hours of Service Act, the verdict was improperly directed, and the judgment should be reversed. The employé concerned was concededly engaged in the movement of trains. A violation of the provisions of the act, accordingly, appears from the record, if the act applied to the defendant.

The only question for decision is whether or not the defendant was a common carrier engaged in the transportation of passengers or property by railroad in interstate commerce. The act applies to that class of corporations only. The plaintiff was required to show (1) that the defendant was a common carrier; (2) that it was engaged in the

transportation by railroad of passengers or property; and (3) in interstate commerce. The status of the defendant will best appear from the recital of facts stipulated into the record, and which are as follows:

"Atlanta Terminal Company, the defendant, is a corporation, chartered under the railroad law of Georgia as a railroad corporation. The defendant does not operate any trains, either freight or passenger, for itself, and owns and controls no locomotives or cars. It owns a passenger terminal station, known as the 'Atlanta Terminal Station,' and as a part thereof has a train shed with numerous tracks extending throughout the length of said shed and beyond the same, connecting with the lines of the various railroads that use said station for their passenger business. The railroads entering and using this station are Southern Railway, Central of Georgia Railway, Atlanta & West Point Railroad, Seaboard Air Line Railway, and Atlanta, Birmingham & Atlantic Railway. Certain trains of the Louisville & Nashville Railroad and Nashville, Chattanooga & St. Louis Railway now connect with the Central of Georgia Railway, and also with this station. In March, 1917, the Southern Express Company occupied space in said Terminal Station and handled their own express matter. The passenger trains of the various railroad lines handling mail received and mail delivered to the Atlanta Terminal Station; this mail being handled to and from the trains by employés of the Atlanta Terminal Station, but from the station into the city and from the city into the station by the United States mail service. No freight business for any of the railroads was handled by or through the Atlanta Terminal Station, but the Atlanta Terminal Company, acting for the various railroads, furnished ticket agents to sell tickets, and baggage agents to check and transfer baggage to and from trains. The Terminal Station also furnished porters, train callers, and gatemen to direct passengers in going to and from trains. Atlanta Terminal Station also furnished car inspectors to examine the equipment of trains leaving the station, and trains were not allowed to leave the station until directed to do so by the station master. In addition to the above, said Atlanta Terminal Company operated a telegraph office.

"The Atlanta Terminal Station furnishes its own track men, who keep up the track that belongs to the company. It also furnishes tower or signal men, who are located just north and south of the main shed, for the purpose of changing switches and letting trains in and out of the station. These tower men are under the direction of the station masters. All trains are switched or moved, as well as made up, by the respective railroads that enter said station, but their movement in the station or station grounds is under the direction and control of the Terminal Company station masters. The telegraph office of the Atlanta Terminal Company connects with four dispatchers' offices of the Southern Railway, operating with five dispatchers. These offices are at Atlanta, Birmingham, Greenville, and Williamson. It connects with the dispatcher's office of Atlanta & West Point Railroad Company at Montgomery. It connects with the dispatcher's office of the Atlanta, Birmingham & Atlantic Railway at Manchester, Ga. It connects with the Seaboard Air Line dispatcher's office in Atlanta, Ga. The telegraph office, through its operators, handles train orders. The telegraph office of the Atlanta Terminal Company handles train orders for the respective railroads entering its station, respecting the movements of trains out of the Atlanta Terminal Station; a great many of the trains handling passengers from other states and into other states. These train orders relate exclusively to trains leaving the Atlanta Terminal Station for other points, and cover instructions to the conductors and engineers as to the moving of their respective trains and as to meeting other trains on the respective railroads."

1. That the defendant, under the facts stated, was a common carrier of passengers and baggage, has been settled by the decisions of the Supreme Court, notably the cases of United States v. Union Stockyards, 226 U. S. 286, 33 Sup. Ct. 83, 57 L. Ed. 226, and United States

**v.** Brooklyn Eastern District Terminal, 249 U. S. 296, 39 Sup. Ct. 283, 63 L. Ed. 613.   In the latter case the Hours of Service Act was held to apply to a terminal company, which performed similar duties and in a similar manner to those performed by the defendant under the facts stipulated.   The Supreme Court in that case said:

"The precise question presented is, therefore, whether the fact that the Terminal conducts these operations, not as an integral part of a single railroad system, but wholly as an agent for one or several, exempts the railroad companies, because they are not the employer, and exempts the Terminal because it is not a common carrier; thus making inapplicable a provision regarding the physical operation of the property devised for the protection of employés and the public.   One who transports property from place to place over a definite route as agent for a common carrier may, under conceivable circumstances, be a private carrier.   But what is there in the facts above recited to endow the Terminal with that character?   The service which it performs is distinctly public in character; that is, conveying between Brooklyn and points on any of the ten interstate carriers and their connections all property that is offered.   The fact that the railroad of the Terminal is short does not prevent it from being a common carrier.   United States v. Sioux City Stockyard Co. [C. C.] 162 Fed. 556.   Nor does the fact that the thing which it undertakes to carry is contained only in cars furnished by the railroad companies with which it has contracts.   Railroads, whose only service is hauling cars for other railroads, have been held liable as common carriers under the Safety Appliance Acts  *  *  *  (Union Stockyards Co. of Omaha v. United States, 169 Fed. 404 [94 C. C. A. 626], Belt Railway Company of Chicago v. United States, 168 Fed. 542, 93 C. C. A. 666, 22 L. R. A. [N. S.] 582); and under the Twenty-Eight Hour Law,  *  *  *  (United States v. Sioux City Stockyards Co., supra).  *  *  *  In no respects, therefore, does the service actually performed by the Terminal for or in respect to shippers differ from that performed by the railroad companies at their other stations. True, the service is performed by the Terminal under contracts with the railroad companies as agent for them, and not on its own account.   But a common carrier does not cease to be such merely because the services which it renders to the public are performed as agent for another.   The relation of connecting carriers with the initial carrier is frequently that of agent.   See Bank of Kentucky v. Adams Express Co., 93 U. S. 174 [23 L. Ed. 872].   The relation of agency may preclude contractual obligations to the shippers, but it cannot change the obligations of the carrier concerning the physical operation of the railroad under the Hours of Service Act, which as this court has said must be liberally construed to secure the safety of employés and the public.   Atchison, Topeka & Santa Fé Railway Co. v. United States, 244 U. S. 336 [37 Sup. Ct. 635, 61 L. Ed. 1175, Ann. Cas. 1918C, 794]."

2. The defendant contends, also, that it was not engaged in transportation of passengers or property by railroad.   It is true that it had no cars or engines and no trainmen or engineers.   It had, however, railroad tracks, a station, switches, and a telegraph office and signal towers.   It employed a station master, signal tower men, car inspectors, telegraph operators, ticket sellers, and baggage checkers and handlers.   It is true that the passengers and baggage were carried on the cars and by the engines of the various railroad companies entering the terminal.   However, they became passengers as soon as they bought tickets from defendant's agents, and while still on the defendant's station premises, and before boarding their train.   Part of the transportation preceded their entrance to their trains, and that part was handled exclusively by the defendant.   The same is true as to the

passengers' property. It became baggage and began its transportation as soon as it was checked in the defendant's baggage room. After the passenger boarded the coach, and after his property was loaded into the baggage car, both still remained under the control of the defendant, until the train had left the terminal track. Until that time its movements were subject to the control and direction of the defendant's station master, to whose orders the train crew was subservient, and whose orders alone could start or stop the train while it was within the terminal limits. The train orders which governed its movements, after its departure, were transmitted to the train crew through the defendant's telegraph operator—the same person who is alleged to have been kept on duty in violation of the act. So that while the manual acts which started, moved, and stopped the train were not those of the defendant's employés, the orders and directions which put it in motion and caused it to stop were those of defendant's employés.

Direction and control are as much a part of transportation as are the physical acts of running the engine or handling the train. It is also true that trains, in motion, could only enter and leave the terminal tracks through switches thrown by signal men of defendant, and upon signals given the train crews by defendant's signal men. These acts were acts of transportation, and the defendant was engaged in transportation of passengers and baggage, upon a railroad, while doing them. The fact that the railroad company engaged jointly with defendant in the transportation does not change the conclusion reached. If the railroad companies had performed the entire service themselves, it would all have been transportation. The fact that part of it was performed by their agent, a separate corporation, does not make it less so. That it was transportation by railroad appears from the fact that it was carried on by a corporation organized as a railroad company and over its own railroad tracks. That they were short ones does not signify; nor does the fact that the defendant did not own the engine or cars. The mischief sought to be remedied by the Hours of Service Act is the same, whether the service is performed by the railroad company or by its agent, the Terminal Company, jointly with it, and whether by the use of its own cars and engines or those of the Terminal Company. It is equally important that the remedy be applied to the latter as to the former. The hazard from the excessive hours of service is the same in either case.

3. That the service performed by the defendant was interstate transportation appears clearly from the stipulated facts. The transportation of the railroad companies in which it participated was interstate transportation of passengers and baggage. The fact that the defendant performed its part thereof entirely in Georgia is unimportant, since it was part of an interstate movement and partook of the nature of the entire movement. Union Stockyards Co. v. United States, 169 Fed. 404, 94 C. C. A. 626; United States v. Stockyard Co., 226 U. S. 286, 33 Sup. Ct. 83, 57 L. Ed. 226.

We think the defendant was a common carrier engaged in the transportation of passengers and baggage by railroad in interstate com-

merce, within the meaning of the Hours of Service Act of March 4, 1907, and that the District Court erred in directing a verdict in its favor, which requires a reversal of the judgment appealed from.

Reversed.