**LOUISVILLE AND NASHVILLE RAIL-ROAD COMPANY, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

and

**Railway Labor Executives' Association and Atlanta Employees Protective Association, Intervening Defendants.**

**Civ. A. No. 3761.**

United States District Court
W. D. Kentucky,
at Louisville.

Aug. 5, 1965.

Joseph L. Lenihan, H. G. Breetz, Louisville, Ky., for plaintiff.

William E. Scent, U. S. Atty., Louisville, Ky., for defendant United States.

Leonard S. Goodman, Office of Gen. Counsel, I. C. C., Washington, D. C., for defendant Interstate Commerce Commission.

James L. Highsaw, Jr., Washington, D. C., and Robert E. Hogan, Louisville, Ky., for intervening defendant Railway Labor Executives' Ass'n.

John W. Chambers, Atlanta, Ga., for intervening defendant, Atlanta Employees Protective Ass'n.

Before MILLER, Circuit Judge, BROOKS, District Judge, and ROY M. SHELBOURNE, Senior District Judge.

SHELBOURNE, Senior District Judge.

The Louisville and Nashville Railroad Company (L & N) filed this action seeking to annul and set aside certain portions of the reports and orders of the Interstate Commerce Commission (Commission) in a proceeding styled Louisville & Nashville Railroad Company, et al., Merger, Etc., Finance Docket No. 18,845. In that proceeding the Com-

mission approved the merger of the property and franchises of the Nashville, Chattanooga & St. Louis Railway (NC & StL) into L & N ownership, management and operation as provided by Section 5(2) of the Interstate Commerce Act, 49 U.S.C. § 5(2). The part of the Commission's report and orders which the L & N attacks relates to extension of employee protective benefits under Section 5(2) (f) of the Act to the railroad employees engaged in the operation of the Atlanta Joint Terminals (AJT).

The controversy here stems from the Commission's report and order of March 1, 1957, in which the Commission indicated that the protective benefits provided for the adversely affected employees of the L & N and NC & StL would likewise extend to and cover employees of AJT, if, in fact, they were adversely affected as a result of the merger. 295 I.C.C. 457, 502.

April 8, 1957, the Atlanta Employees Protective Association, representing AJT's employees, filed with the Commission a petition for leave to intervene and sought a reconsideration of the Commission's order on the ground that the order did not adequately protect the employees of AJT. By its order dated July 10, 1957, the Commission granted the petition for leave to intervene but denied reconsideration of its previous order. The merger of the NC & StL into the L & N was effected August 31, 1957. The L & N petitioned the Commission with respect to the relief afforded the AJT employees on August 15, 1958, and its petition was rejected.

The Commission reopened the proceeding on its own motion on June 9, 1959, for the sole purpose of determining the nature and organizational character of AJT and the relationship of its employees with those of the L & N. By its report and order of October 26, 1961, following a hearing, the Commission determined on the facts before it that the employees of AJT must be regarded as being joint and common employees of the L & N and affiliated carriers, which created shared responsibilities and expense

in AJT's operations. It ordered that the AJT employees were entitled to protection under Section 5(2) (f) of the Act if their employment was adversely affected by the merger. 312 I.C.C. 676.

The complaint in this action was filed by the L & N on March 6, 1959, challenging the validity of the Commission's order of March 1, 1957, granting the protective benefits of Section 5(2) (f) to the AJT employees. The Railway Labor Executives' Association and the Atlanta Employees Protective Association were permitted to intervene as defendants on April 6, 1959. After the Commission reopened the proceedings before it, this Court suspended further action on L & N's complaint on June 30, 1959. Subsequent to the termination of the reopened proceedings before the Commission, the Court sustained L & N's motion to file an amended complaint by its order of September 11, 1963. Answers were filed by the defendants and intervening defendants, extensive briefs were submitted, and the case was argued before this Court comprised of three judges November 13, 1964.

The L & N does not dispute the facts on which the Commission based its determination that the AJT employees were the joint employees of the L & N, the Georgia Railroad (Georgia), and the Atlanta & West Point Railroad Company (A & WP). The L & N's challenge is to the conclusion from the established facts drawn by the Commission, and it claims that the Commission's decision lacks a rational foundation in law because it fails to take cognizance of the significance and meaning of the facts. It is contended that the Commission's decision regards AJT as a separate entity, a carrier, and an employer in its own right and also as a mere aggregate of the three railroads which created it, and that such treatment of the facts is an obvious logical fallacy.

The Commission rejected the L & N's argument and in its report of October 26, 1961, the Commission said:

"Assuming, as we do, that the nature of the services performed by Ter-

minals requires that it be considered a common carrier as that term is defined in section 1(3) (a) of the Interstate Commerce Act, this is not dispositive of the issue of the relationship of the terminal employees to Louisville. In our opinion, even if Terminals should properly be considered a carrier for purposes of regulation under the Act, we are not precluded from finding that there exists between Terminals' employees and Louisville an employee-employer relationship. Nor does the fact that Terminals has been treated as a carrier in the field of labor relations preclude such a finding. While the factors relied on by Louisville have been considered along with all of the facts and circumstances embodied in the record before us, we do not regard them as controlling."

The L & N has advanced a second somewhat similar but distinct argument. In this line of attack, L & N charges that the Commission exceeded its authority by treating AJT as a mere aggregate and creature of three railroads when Section 1(3) (a) of the Act defines "common carrier" in such terms that AJT must be considered a carrier in its own right for purposes of the Act. It is argued that the Commission disregarded the definitions prescribed by Congress for proper administration of the Act when it stated in its report of October 26, 1961, supra, that AJT must be considered a common carrier as that term is defined in the Act but that it did not regard this as dispositive of the issue or controlling. L & N contends that the Commission cannot disregard the status conferred on AJT by the Act for the purposes of Section 5(2) (f) when for "purposes of regulation" within the framework of the Act the Commission recognizes AJT as a carrier in its own right. It is claimed that the Commission's determination is not only an arbitrary exercise of its administrative function but is also beyond the Commission's statutory authority.

In reply to the arguments advanced by the L & N, the Commission contends that AJT's status as a legal entity, employer or carrier is irrelevant because the existence of an employee-employer relationship between the employees at AJT and the L & N is a question of fact. Walling v. Western Weighing & Inspection Bureau, 7 Cir., 160 F.2d 47, 48 (1946). Since the issue is purely factual, the Commission maintains that the Act permits a determination in a proper case that the employees of one carrier are also the employees of another carrier for the purposes of Section 5(2) (f). Railway Labor Executives' Association v. United States, D.C.Va., 216 F.Supp. 101 (1963). The Commission asserts that this is a proper case for such a determination, as a finding that employees at AJT are joint employees of the L & N and its affiliated carriers is supported by substantial evidence.

The L & N argues in rebuttal that this is not a proper case for such a determination because there is no evidence to support a finding that AJT as a carrier and L & N as a carrier jointly employ AJT's employees. It is contended that the finding actually made by the Commission that AJT personnel is jointly employed by L & N, Georgia, and A & WP is legally unsound because such a determination disregards AJT's status as a carrier.

The L & N insists that under the opinions in such cases as United States v. Brooklyn Eastern Dist. Terminal, 249 U.S. 296, 39 S.Ct. 283, 63 L.Ed. 613 (1919); United States v. State of California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936); Union Stock Yard & Transit Co. v. United States, 308 U.S. 213, 60 S.Ct. 193, 84 L.Ed. 198 (1939), and United States v. Atlanta Terminal Co., 5 Cir., 260 F. 779 (1919), the corporate character of AJT with respect to its employees being within the ambit for protection under Section 5(2) (f) depends not upon whether it is incorporated or unincorporated but depends upon *what it does*.

The plan and practice for operation of AJT has been: Atlanta Joint Terminals is unincorporated and in the written agreement executed April 1, 1907, be-

tween L & N and Atlantic Coast Line, lessees of the Georgia Railroad, first parties; Atlanta & West Point Railroad Company, for itself and as lessee of the Atlanta Belt Railroad, second party, and L & N, third party, is referred to as "an arrangement for the common use of terminals and not a partnership between the parties hereto." The duration of the "arrangement" was for the term of a lease to Georgia Railroad and its lessees, L & N and Atlantic Coast Line, which will expire April 1, 1980.

Each of the parties conveyed its ownership and leasehold property rights in the trackage, buildings, terminal facilities, and appurtenances in the area of the terminal. Rental for the terminal equivalent to five per cent interest on the agreed valuation for the properties of Georgia was provided. Reimbursement for investments and expenditures by the other participants in the proposed operation was to be prorated according to the ratio of the cars, engines and cabooses of each carrier entering and leaving the terminal properties to the total number of cars, engines and cabooses of all the carriers. Provision was made for proration for payment of state, county and municipal taxes and for the cost of maintenance and operation of the properties and supervision of the terminal.

The necessary switch engines were furnished by the parties based upon estimates of the work requirements of each participant. Provision was made for the creation of funds with which to pay locomotive and car repairs and supplies.

The general supervision of the terminal property was vested in a board of control comprised of the persons holding the position of general manager with the parties to the agreement. The board made the rules for the government of employees and operation of the terminal, and appointed a superintendent of terminals who had charge of the properties and operation as a joint officer and to whom all officers, agents and employees reported. The superintendent of terminals appointed a joint local agent to be in charge of the freight houses, transfer platforms and team delivery tracks. With the approval of the board of control, he appointed a mechanical foreman to supervise the operation of shop and roundhouse facilities.

In addition to performing all auditing functions of the terminal, Georgia rendered and paid bills to other railroads and industries in connection with local switching, handled claims for personal injuries and loss and damages to freight, and had charge of admission of other carriers to use of the terminal. Georgia maintained the bank checking accounts of the terminal in the names of Georgia's lessees and issued the terminal pay checks and drafts in payment of claims allowed for injuries to employees of the terminal.

The chairman of AJT's board of control is the general manager of the Georgia appointed by Georgia's executive committee, who were and are the presidents of the L & N and Atlantic Coast Line. The chairman also serves as president and general manager of A & WP and Western Railway of Alabama and is the chief executive officer of those railroads and AJT.

AJT for years has been subject to the hours of service law as a common carrier. Its employees were represented by unions separate and distinct from those representing employees of the L & N, and since 1937 the National Mediation Board has certified such representatives of AJT's employees as provided by the Railway Labor Act, 45 U.S.C. § 152, Ninth. The AJT employees have a union shop agreement and L & N employees do not. All of the terminal employees' bargaining agreements are conducted and made with AJT and disputes and claims arising from such agreements have been taken to the National Railroad Adjustment Board. The L & N has participated in none of such agreements, negotiations or proceedings. The employees of AJT and the employees of L & N have no employment or seniority rights either in the other.

The plan and practice in the operation of AJT has been as set out above since its organization.

All of these facts were recognized by the Commission in its decision in this case admitting that AJT is a separate, unincorporated association and is a common carrier. Yet, the Commission concluded that AJT employees were entitled to protection as required by Section 5 (2) (f) as employees of L & N if, in fact, their employment was adversely affected as a result of or in anticipation of the merger.

In the case of Railway Labor Executives' Association v. United States, D.C. Va., 216 F.Supp. 101 (1963), employees of the Chesapeake & Ohio Railway Company at the Main Street station in Richmond, Virginia, sought to annul and vacate certain orders of the Commission denying them the protective benefits provided under Section 5(2) (f) of the statute. The Main Street station had been built and occupied since 1901 in a joint operation by the C & O and the Seaboard Air Line Railroad. Up to 1959, the terminal was operated by employees of the C & O under a contractual arrangement with Seaboard involving an apportionment and reimbursement of its proportionate cost of the operation by Seaboard. In 1959, the Commission granted Seaboard authority to acquire joint control and use of the Broad Street station and following the acquisition Seaboard abandoned any use of the Main Street station. Seaboard's withdrawal decreased the number of C & O employees needed to operate that terminal. The employees who were furloughed or laid off because of the reduction brought suit charging that they were railroad employees affected by the Commission's order granting Seaboard authority to acquire the Broad Street station and that their employment was not protected in the order as required by the Act.

The Commission's action in denying C & O's furloughed employees protection under Section 5(2) (f) was upon the basis that C & O was not a party to or involved in the proceeding before the Commission by which Seaboard obtained authority to acquire the Broad Street station. The Commission conceded in its reports and orders that the plaintiffs were railroad employees affected by the transaction but held they were not employees affected within the purview of Section 5(2) (f) of the Act. The court held that the interrelation between Seaboard and C & O at the Main Street station was such as to give the plaintiff employees a right to the relief they sought. The orders of the Commission were vacated by the Court with instructions that the plaintiff employees be treated as coming within the ambit of Section 5(2) (f).

The case of Railway Labor Executives' Association v. United States, D.C.Va., 226 F.Supp. 521 (1964), arose out of the Commission's approval of the acquisition of stock control of the Central of Georgia Railroad Company by Southern Railway. When it approved the transaction the Commission had full knowledge that Southern proposed to consolidate Central's freight agencies, yards, shops and accounting department into those of Southern which would, and did, result in job losses and hardships to many employees. In recognition of such hardships and losses, the Commission imposed conditions for the protection of the employees affected by the transaction which it determined met the requirements of Section 5(2) (f) of the Act and provided fair and equitable treatment of all employees coming under the protective aegis of the statute. In describing the duty of the Commission under Section 5(2) (f) at page 523 of its opinion, the court said:

> "The Commission is free in its discretion to make different findings, to reach different conclusions, and to impose different conditions *predicated upon its evaluation of the facts of record relating to each individual transaction,* so long as it does not fail to meet the minimum statutory criteria and is fair and equitable." (Emphasis added.)

It was decided in that case that the Commission's order had provided proper measures of protection for the employees of Central affected by the transaction which resulted in hardships and job losses.

**342**

In his opinion in Brotherhood of Maintenance of Way Employees v. United States, D.C.Mich., 221 F.Supp. 19, 30 (1963), Judge O'Sullivan said:

"In all events, it is not our function to substitute our judgment for that of the Commission. Minneapolis & St. Louis R. Co. v. United States, 361 U.S. 173, 188, 80 S.Ct. 229, 4 L.Ed.2d 223. The Commission's wisdom and experience, not ours, must determine whether its approval of the C&O–B&O affiliation is consistent with the public interest. McLean Trucking Co. v. United States, 321 U.S. 67, 87, 64 S.Ct. 370, 88 L.Ed. 544."

In considering the respect that courts should manifest for the wisdom and experience of the Interstate Commerce Commission in Minneapolis & St. Louis R. Co. v. United States, 361 U.S. 173, 187, 188, 80 S.Ct. 229, 238, 4 L.Ed.2d 223, the Supreme Court said:

"Resolution of the conflicting considerations 'is a complex task which requires extensive facilities, expert judgment and considerable knowledge of the transportation industry. Congress left that task to the Commission "to the end that the wisdom and experience of that Commission may be used not only in connection with this form of transportation, but in its coordination of all other forms." 79 Cong.Rec. 12207. "The wisdom and experience of that commission," not of the courts, must determine whether the proposed [acquisition] is "consistent with the public interest."'" (Citing cases.)

The above statement was made by the Supreme Court as to the significance and purpose of the statute here in question although not involving the identical issue. The Supreme Court said that the wisdom and experience of the Commission, not of the courts, must determine questions arising under Section 5(2) of the Act, 49 U.S.C. § 5(2).

■■ In this case, we are not convinced that the Commission committed an error of law or that its action was arbitrary, capricious or an abuse of discretion. In our opinion, its findings of fact are supported by substantial evidence. We, therefore, are not authorized to disturb the conclusions of this experienced agency of the Government charged with manifold duties in the field of transportation, no small part of which is in the area of mergers and affiliations in an effort to "slow down and arrest the economic deterioration of the American railroads."

The complaint in this action should be dismissed and a judgment so providing will be entered.