## Rosenberg v. City of Philadelphia

*Lewis Kates,* for plaintiffs.
*Ralph J. Teti,* for City.

FORER, *J.,* November 12, 1981—This is an action in trespass by plaintiffs, Philadelphia Ceramics, Inc. (Ceramics), a small family manufacturing business, and the individual owners against the City of Philadelphia (City), owner in possession of a property in which a fire occurred and spread to plaintiffs' property.

By a declaration of taking filed June 25, 1976, the City condemned the Impervious Paint Factory (Impervious). Impervious is located at 1672 Kinsey Street, Philadelphia, immediately adjacent to plaintiffs' factory at 1666 Kinsey Street. This is a mixed neighborhood with homes as well as commercial properties. Nearby are an elementary school and a boys' club.

Early Sunday morning April 16, 1978, children threw burning debris through Impervious' broken windows. A fire broke out in the building and spread to plaintiffs' property. The fire went to six alarms; 35 engines were called to the scene. Both fire and water damaged plaintiffs' property. Fortunately no one was injured.

The case was tried for eight days without a jury. A verdict in favor of plaintiff was entered on April 6, 1981 (awarding partial damages) and June 11, 1981 (the balance of the damages) in the sum of $639,752.96.

Defendant raised four principal issues on exceptions: (1) the effect of prior litigation on this action, (2) the negligence of the City as a landowner, (3) the amount of compensatory damages, and (4) the appropriateness of delay damages. Plaintiffs excepted to the refusal to award punitive damages.

Plaintiffs own a small family business manufacturing special decals which can be fused to ceramic or glass surfaces at high temperatures to form a permanent decoration. Transforming artists' sketches into decals through photo silk screen techniques is a complex and exacting process. Plaintiffs began marketing exclusively in the hobby craft industry, but in 1976 expanded into the lamp and lighting industry. The decals plaintiffs produce are hydroscopic (that is, they absorb moisture from the air). In order to produce a high quality product,

plaintiffs maintained rigid temperature and humidity controls in production areas of the building. Plaintiffs also manufactured samples of useful or decorative objects to show how their product can be used and to exhibit at trade fairs.

The City acquired Impervious with the intent of immediately demolishing it and building a recreation facility. Neighborhood pressure and complaints of the factory's filthy and dangerous conditions[1] prompted this decision. At the time of condemnation the Department of Licensing and Inspection knew of Impervious' continuing violations of Fire Code ordinances requiring sprinkler testing and certification. Although Fire Inspector Wexler notified Francis Rush, Real Estate Manager of Public Property[2] for the City to see that the sprinkler was inspected and certified, there is no indication that Rush ever did so.

In September 1977, Impervious vacated the paint factory leaving on the premises $21,000 worth of paint which the City had purchased. In October, the City took possession. James Callahan, retired head of Inventory, Department of Recreation, who inspected the premises shortly thereafter testified, "[It] was the dirtiest place I ever saw. There were old boxes, paint labels spread all over . . . There was paint on the floor, five and six inches thick."

Toward the end of October 1977, the City received bids for demolition. Since it did not give bidders access to the building, they were unaware of

---

1. In 1972, residents of the Kinsey Street neighborhood submitted to the Department of Licensing and Inspection a petition complaining, inter alia, of the "explosive condition" of Impervious. It noted one explosion for which fire engines were summoned.

2. This memo was dated September 14, 1976, three months after the City's condemnation.

the paint and other chemicals inside. Because of the fire hazard, the low bidder repudiated the demolition contract the City had awarded him. Defendant did not attempt to enforce it through litigation but advertised for bids on the removal of the contents. Only one bid in excess of $100,000 was received. The City did not award the contract. Although it planned to find other methods of removal, defendant never did so. Nor did it remove the packaging and other flammable debris or attempt to clean the premises.

By late November, neighborhood children had broken most of Impervious' windows including those near points of access. The City never repaired them. The fire escape door on the second floor was also open on several occasions. Both Maurice Rosenberg, vice president of Philadelphia Ceramics, and Marie Lowber, a neighborhood resident, called the Mayor and other city officials to notify them of the problem. Alvin Zion, Director of Facilities, Department of Recreation, admitted that he had received more than one call informing him that the building was open. Although he knew that Impervious contained hazardous substances, he never checked to learn whether the situation had been corrected.

When James Callahan inspected Impervious for the City, he noted that the building was equipped with a wet pipe sprinkler system. He knew that the building could not be heated because the furnace had been dismantled before the City took possession. In spite of the requirements of the City Fire Code that building temperature be maintained at 40 degrees, defendant took no steps to repair the furnace or provide other sources of heat.

Following a severe cold snap in December 1977, the sprinkler pipes in Impervious froze and burst.

During a subsequent thaw, water poured out of the building and flooded Kinsey Street. Police notified the Water Department which shut off the water. Defendant admits that it failed to have the sprinkler system repaired or water service restored.

The spread of the fire was accelerated by the flammables in Impervious. Fire Captain Lepre testified that activation of a sprinkler system inside the paint factory would have slowed the progress of the fire. As a result of the actions of the fire department in putting out the fire, plaintiffs' premises were saturated with dirty water that filtered through the walls into its very foundations. Sensitive machinery, art work, decals, samples and supplies were damaged or destroyed. Fire extensively damaged the roof of plaintiffs' building. Only the north and west sides of the building were untouched.

## PRIOR LITIGATION

Plaintiffs were insured by Insurance Placement Facility of Pennsylvania (IPF). They were substantially underinsured, having only $125,000 coverage on the building and $125,000 on the contents (D-13, D-14). They were not insured for business interruption. After the fire, plaintiffs retained an insurance adjustor, Benjamin Weinstein, to represent them in presenting a claim.

Under a "coinsurance factor" provision of the insurance policy, corporate plaintiff would be penalized for underinsurance if it made a claim for the full value of insured property. In order to avoid this penalty, Weinstein recommended that plaintiffs' understate the value of each of the various items of loss. The Rosenbergs, unsophisticated business people, relied on Weinstein's advice. The Court finds that they did so in good faith. Claims in the

amount of $65,645 for the building and $107,911 for the contents were submitted and paid by IPF (D-13, 14, 15 and 16).

Plaintiffs' claims against defendant were subrogated to IPF with IPF retaining the power to "prosecute, compromise or withdraw" the action (D-15, D-16). When Patrick O'Connor brought suit against the City on behalf of IPF (Rosenberg v. City of Philadelphia, April term, 1979, no. 1965), plaintiffs directed him to exclude claims above and beyond those paid by the insurance company. This action (first action) was settled on November 10, 1980, prior to the commencement of trial to this litigation (present action). Plaintiffs were not consulted about the settlement or informed that it had taken place.

During the fall of 1978, Benjamin Winderman, plaintiffs' attorney at that time, attempted to negotiate a settlement with the City with respect to claims not covered by insurance payments. Plaintiffs desperately needed money to save their business. In February 1979, plaintiffs and City reached an agreement providing that if corporate plaintiff relocated and plaintiffs signed a general release of all claims (except business interruption), the City would purchase the fire damaged building in "as is" condition for $85,000 and assist plaintiffs in obtaining tax free financing. Defendant had 180 days to have the purchase approved by The Mayor and City Council. If Approval was not obtained, either party could cancel the agreement. In good faith reliance on this agreement, plaintiffs purchased and adapted the premises at 6017 Keystone Street.

Defendant's conduct following settlement was marked, if not by bad faith, by indecision and evasiveness. Although the City prepared an ordinance for approval of the purchase, it never submitted it to City Council. Accordingly the settlement agreement

and general release were voided. On September 20, 1979, plaintiffs filed a complaint in equity seeking specific performance of the agreement and compensatory, punitive and delay damages (present action). Pursuant to defendant's preliminary objections, plaintiffs' request for specific performance was stricken and the matter transferred to the law side.[3]

Although the City's attorney, Steven Corbman, was well aware of the first action when the present action was instituted, he never requested consolidation. Although the first action was settled before trial in the present action began, defendant's trial counsel, Assistant City Solicitor Ralph Teti, did not inform the court until the sixth day of testimony. At that time, he moved to amend the City's answer to the complaint by adding new matter. By arguing that the order of settlement in the first action was res judicata with respect to any issues which could have been litigated therein, the City sought to have the present action dismissed. The court denied the City's motion to amend.

All affirmative defenses, including res judicata, must be pleaded as New Matter in responsive pleadings. Pa.R.C.P. 1032. Defendant does not have unlimited time to plead these defenses. Martin v. Wilson, 371 Pa. 529, 92 A.2d 193 (1952). Plaintiff is "entitled to be informed, before proceeding to the expense and burden of a fruitless trial," of defenses which make litigation on substantive issues unnecessary. Martin v. Wilson at 534; Echon. Admx. v. Pennsylvania RR Co., 365 Pa. 529 (1950). The purpose of the rule is to encourage such efficiency. Festa v. Shuman Bros. 87 D.&C. 152, 155 (1953).

---

3. This court does not understand the basis for this interlocutory order. The case proceeded as an action in trespass for damages.

In the cited cases, the moving party presented an affirmative defense at or prior to the time of trial. In this case, defendant, although fully aware of the settlement long before trial, raised the defense only after six days of trial. The motion to amend was untimely. Moreover, the City is estopped from changing its position to the detriment of plaintiffs who had relied on the City's good faith in negotiations and on its pleadings.

The City argues that in this action plaintiffs would recover twice for the same losses. Under the "collateral source rule", a plaintiff may recover more than once for the same injuiry, provided the recoveries come from different sources. Smith v. U.S., 587 F.2d 1013 (3d Cir. 1978); Kagarise v. Shover, 218 Pa. Super. 287, 275 A.2d 855 (1971). The City, therefore, is not entitled to have the judgment against it reduced by the amount of plaintiffs' insurance recovery. However, defendant may not be required to pay more than once for the same injury.

Defendant claims it has paid twice for several items of damages claimed in this action. Defendant's payment under the order of settlement in the first action and defendant's payment of damages in the present action are both reparation for injuries arising out of the fire. However, damages have not been awarded for any items reimbursed under the first action.[4]

## NEGLIGENCE OF THE CITY

Under Pennsylvania law, an owner of vacant property is required to maintain the exterior of the building so that it does not, by visible disrepair, attract arsonists and other vandals. The owner also

---

4. Items inadvertently covered twice have been deleted following the argument sur exceptions.

has the broader duty to maintain the structure, both interior and exterior, in a reasonably safe condition. Ford v. Jeffries, 474 Pa. 558, 379 A.2d 111 (1977); see also Restatement (Second) of Torts §365 (1965).

Defendant failed to keep either the exterior or the interior in good repair. Windows remained broken and the building deteriorated. The manner in which the fire occurred demonstrates that the condition of the property invited vandalism and arson.

Although it knew Impervious contained flammable chemicals, the City failed to secure the building. Although it knew of the danger of arson, the City never repaired the sprinkler system. Although it knew the sprinkler system was not operating, the City failed to remove the combustibles. Despite the role of arsonists in this case, the court finds that the negligence of the City was a "substantial cause" of the fire and the spread of the fire. Ford v. Jeffries, supra at p. 114. The City failed to maintain the premises at 1672 Kinsey in a reasonably safe condition. Neither the intent to demolish the premises nor the cost of removal of the hazardous combustibles can justify this long-continued negligence. Property owners must bear the burden of maintaining their real estate and not permitting it to become a danger. In the face of a clear risk of harm to the neighborhood and plaintiffs' property, defendant failed to act. The Court, therefore, finds it grossly negligent. Bowman v. Pennsylvania RR, 299 Pa. 558, 149 Atl. 877 (1930).

Under Pennsylvania law, violation of a legislative enactment (or administrative regulation) constitutes negligence per se. Kaplan v. Kaplan, 404 Pa. 147, 171 A.2d 166 (1961), Ray Klump, Inc. v. Ephrata Borough, 18 D.&C. 2d 61 (1959). Under certain conditions such violation constitutes basis

for civil liability. See Ennis v. Atkins, 354 Pa. 165, 47 A.2d 217 (1946); Jinks v. Currie, 324 Pa. 532, 188 Atl. 356 (1936). The Pennsylvania Supreme Court has cited with approval, Restatement Torts §286 (1934).

Section 286 reads as follows:

The violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if:

(a) the intent of the enactment is exclusively or in part to protect an interest of the other as an individual; and,

(b) the interest invaded is one which the enactment is intended to protect; and,

(c) where the enactment is intended to protect an interest from a particular hazard, the invasion of the interests results from that hazard; and,

(d) the violation is a legal cause of the invasion, and the other has not so conducted himself as to disable himself from maintaining an action.

Section 4-1003(2) of the Building Code provides: "Automatic sprinkler systems shall be installed in A-Hazardous Occupancies," that is, buildings used for the storage of highly combustible or explosive material. The court finds that Impervious was an A-Hazardous Occupancy.

Section 5-1401 of the Fire Code provides, that,

[I]n all buildings where the regulations of the Department require automatic sprinklers, there shall be installed an approved wet pipe system . . . maintained at a temperature not less than 40°. Where sufficient heat is not provided, such areas shall be equipped with approved dry pipe systems.

Section 5-1403 requires that,

[S]prinkler systems . . . which have been installed . . . because of any law or ordinance shall be main-

tained in operative condition at all times and no owner or occupant shall reduce the effectiveness of the protection furnished.

In failing to heat the Impervious building and to repair the ruptured sprinkler system, the City clearly violated Sections 5-1401 and 5-1403.

Section 1603(2) of the Building Code (Duties of Owners, Vacant Commercial and/or Industrial Buildings Found to be Public Nuisances) provides:

The owner of any vacant commercial and/or industrial building shall keep all doors, windows and openings from the roof or other areas in good repair where such doors or windows or openings are readily accessible to trespassers they shall be kept securely locked or fastened. The owner shall take any other measures . . . to prevent unauthorized entry to the premises by closing all openings with sheet metal or other material. (emphasis supplied)

A public nuisance is defined under §4-1602(e)(2) as a building "so open as to allow trespassers to enter therein and which . . . has not been properly sealed by the Department." The court finds that under this definition, Impervious clearly constituted a public nuisance. Testimony of the neighbors and City officials clearly proved that the City failed to keep the windows in good repair or to take other measures to prevent unauthorized entry and that the City was aware of the conditions and dangers.

Under the conditions set forth in Restatement, Torts §286, these violations by the City create civil liability. The ordinances were obviously intended to protect interest of an adjoining property owner. Restatement §286(a). Plaintiffs' building, machinery, stock, supplies and future profits, were clearly interests which the enactment intended to protect. Restatement §286(b). The Fire Code ordinances were intended to protect interests from . . . [the] particu-

lar hazard of fire and the spreading of fire. Restatement §286(c).

The legislative findings that head Chapter 4-1600 show that §4-1603 of The Building Code was also intended to protect against the hazard of fire. They state that:

Scattered throughout the City are a large number of vacant commercial and/or industrial buildings which have been broken into, vandalized . . . and are potential fire hazards . . . which constitute . . . [a danger] to the health, safety and welfare of the public.

There can be no doubt that the negligence of the City in leaving the Impervious building in a hazardous condition was the proximate cause, i.e., a substantial factor, in the conflagration in the Impervious building and the spread of the fire to plaintiffs' premises. Restatement §286(d). The court finds that the acts and omissions of the defendant constitute negligence per se.

## COMPENSATORY DAMAGES

The difficult question in this case is damages. Plaintiffs presented evidence of 22 categories of loss, most of which were disputed by defendant. Three objections recur in defendant's Exceptions to the court's award (Order, April 6, 1981, Order, June 11, 1981). Defendant argues that the expenditures for truck rental, rigging, rental of a temporary location, and renovation of the Keystone premises resulted not from the fire but from an independent corporate decision to move to a more advantageous location.

This argument is without merit. Plaintiffs acquired and renovated the Keystone Street building pursuant to the aborted settlement agreement with

the City. Even if plaintiffs had wished to remain at Kinsey Street after the fire, they could not have done so. Dirt and dampness made the production of a good quality product impossible. The court finds that these expenditures resulted from the fire and not from an independent corporate decision to relocate.

Defendant also argues that it has paid twice for rental of refuse containers, repairs to the Kinsey Street location, equipment repairs, replacement of samples, preparation of a temporary catalogue, equipment replacement and art inventory. (See supra, p. 10). The court finds that defendant has paid for art inventory in the first action, and that plaintiff failed to prove with reasonable certainty losses in this category exceeding the insurance recovery. (Order Sur Exceptions, October 14, 1981). As to preparation of a temporary catalogue, the court finds no evidence that defendant previously paid for this item (D-20, 21, 22). As to the five other categories defendant cites, the court finds that plaintiff has proved with reasonable certainty losses exceeding the insurance recovery.

Finally, defendant urges that the court erred in measuring damages for art inventory, samples, stationery and supplies and equipment by replacement value rather than market value. Market value is only one means of arriving at a just award. It is not in itself the value of an article but evidence of value. Lloyd v. Haugh, 223 Pa. 148, 156 (1909). When the market value of an item is not a fair measure, the special value to the owner must govern. Rhoades, Inc. v. United Air Lines, Inc. 244 F. Supp. 341 aff'd 340 F.2d 481 (1963); also see, Arkney v. Pa. Electric Co. 31 Som. L.J. 253 (1973). In assessing this value, the court must consider the item's "cost, the practicability and expense of replacing it, and other

such considerations as in the particular case affect its value to the owner." Lloyd v. Haugh, supra at 157.

Since the court has not awarded damages for art inventory beyond the insurance recovery, the issue as to that item is moot. Pre-inscribed stationery, office labels, and forms, though having some small market value, could not have commanded a price representing their value to their owner. Lloyd v. Haugh, supra. The value of the samples, unique pre-decorated objects (sometimes unfinished pieces of items such as lamp bases) could hardly be measured by market value, but is more fairly represented by the time and expense required to reproduce them. The question as to equipment is a closer one. However, since plaintiffs' business is a highly specialized and technical one, the court found that the award for the destruction of machinery used in the business is better measured by replacement value.

The following items of damage were documented by checks, receipts and invoices:

1. Security Expenses in the amount of $4,068.90. The fire left plaintiffs' building in a deteriorated condition attractive to vandals and plaintiffs were therefore justified in hiring a security guard to protect it.

2. Replacement of Stationery and Office Supplies in the amount of $3,488.64. After the fire, plaintiffs had to purchase new stationery and office supplies "[t]o inform people of the fire, for public relations purposes, to have the new address printed onto instruction forms, invoices, envelopes [and] labels.

3. Truck Rental in the amount of $5,118.64. Plaintiffs rented a truck to move stock and equipment to their homes for sorting and cleaning, to move operations to the temporary location at

Progress Lighting and the move to the new building on Keystone Street.

4. Rental for Removal of Refuse Containers in the amount of $1,796.15. Both at Kinsey and at Keystone Streets, plaintiffs rented dumpsters and contracted for their removal. They also employed outside labor to assist in the cleanup.

5. Miscellaneous Repair Parts in the amount of $265.48. This category included "lubricating oil, small repair parts to make initial repairs . . . [and] hardware.

6. Equipment Rental in the amount of $726.05. Plaintiffs rented humidifiers and dehumidifiers to try to restore a drier atmosphere at Kinsey Street. Because many samples used for display were destroyed, they also rented projectors to show slides at trade fairs.

7. Repairs to the Kinsey Street location in the amount of $6,022.48. In order to remain even temporarily at the Kinsey Street location, plaintiffs had to have electrical service restored, a temporary roof installed and carpentry work performed.

8. Rigging and Hauling in the amount of $4,322.05. These expenditures were for the rental and delivery of forklifts, for rigging and moving kilns and other heavy equipment to Keystone Street.

9. Equipment Repairs and Miscellaneous Expenses in the amount of $28,086.42. This category includes motor repairs, replacement of major parts and cleaning of machinery.

10. Preparation of Temporary Catalogue (partially documented) in the amount of $5,816. Because much of plaintiffs' stock was destroyed in the fire, plaintiff had to prepare a temporary catalogue which accurately represented what was available.

11. Equipment Replacement in the amount of $60,096.50. Plaintiffs claimed $108,296. This category included, inter alia, dehumidifiers, film dryers, a flatbed printing press, a pump and compressor and repairs to the kilns not reflected in the equipment repair category. Since this claim partially overlapped the insurance recovery, the court reduced the amount of damages as stated.

12. Renovation Costs excluding General Labor in the amount of $51,180.07. In order to adapt the Keystone Street building to their production needs, plaintiffs had to install a temperature and humidity control system, vapor barriers and insulation, build walls and partitions and replace a portion of the roof. Plaintiffs were unable to find a building with an environmental control. The cost of building a new building was excessive.

13. Interest on Indebtedness to the Commonwealth, City and Federal Government in the amount of $16,163.08. Because of severe cash shortages after the fire, plaintiffs fell behind in paying Federal and State Income taxes and City Wages Taxes.

14. Interest on Bank Loans Necessitated by the Loss in the amount of $17,894.

The following items of damages had to be reconstructed, either by plaintiffs or their expert witness:

15. Rental of Temporary Locations in the amount of $1,275.50. After the fire plaintiffs resumed operations temporarily at Progress Lighting, a major customer, and at the home of a Ceramics' employee. Plaintiff Rosenberg testified with respect to these expenditures, but was unable to produce receipts. The court finds the expenditures were necessitated by the fire, that the rentals were fair and reasonable and that plaintiffs' witness was credible.

16. Miscellaneous Business Costs and Expenses in the amount of $2,500. Plaintiffs claimed that $10,000 in necessary business expenditures (dehumidifiers, air conditioners, building supplies) were placed on plaintiffs' personal credit cards. However, plaintiffs produced documents showing only $2,500.

17. Replacement of Samples in the amount of $54,500. Maurice Rosenberg estimated that a sample takes 20 hours to produce at $7.50 per hour labor (pre-fire wages). Each sample requires $5 worth of materials. 350 samples were destroyed during the fire and replaced.

18. Theft, Burglary and Vandalism. Because these losses were not causally related to the fire, the court disallowed this item.

19. Lost Profits through the year 1981 in the amount of $245,333. In their exceptions plaintiffs claim $759,840. Sandra Berger, a Certified Public Accountant who was employed by Ceramics, testified as an expert. By applying Ceramics' past average annual growth rate to the years 1978 to 1981, she calculated what sales might have been in those years, but for the fire. She then calculated the difference between these projected figures and actual sales and multiplied the difference by the gross profit percentage of 40 percent. Ms. Berger also reduced that sum by deducting from gross profits "below the line" expenditures to arrive at net profit. The City called as its expert, David Carpenter, the manager of a Finance and Management Accounting Group for Coopers & Lybrand, a certified public accounting firm. Mr. Carpenter is not a Certified Public Accountant. Instead of presenting his projection of lost profits, Mr. Carpenter did nothing more than provide a critique of Ms. Berger's projections.

Both experts agreed that in order to calculate future lost profits one should (1) examine the market, (2) determine the company's share of the market, (3) analyze the company's marketing plans and production capability, (4) evaluate large economic forces affecting the particular market. Both experts agreed that a primary source of information was the company itself and that one would also utilize industry statistics, government data and reports of similar public companies. Defendant's expert never interviewed Ceramics' management, never obtained or examined admittedly crucial documents and did not even completely understand the assumptions of plaintiffs' expert. He did review the company's financial statements and tax returns and plaintiffs' depositions. The court finds that his ability to present expert opinion with respect to the issue of lost profits was limited and offered little guidance to the court. Plaintiffs' expert projected lost profits of $243,762 for 1978 and 1979, $207,385 for 1980, and $308,693 for 1981. These figures were predicated on projected sales of $506,090 in 1978, $753,315 in 1979, $1,121,309 in 1980 and $1,669,068 in 1981. The court notes that prior to the fire in plaintiffs' best year sales were only $340,000. Accordingly, the court found Ms. Bergers' projections too optimistic and reduced the figure to $245,333.

20. Increased Operating Expenses. These expenses arose from the company's inability to purchase or produce in large quantities after the fire. Plaintiffs offered no credible evidence, either worksheets or expert testimony to substantiate this figure. The court disallowed the claim.

21. Replacement of Art Inventory and Supplies. Plaintiffs originally claimed $95,000 in damages to artwork. Plaintiffs estimated that the total value of

the artwork, masks and flats was $123,000. By subtracting the amount of the insurance recovery, $27,000 from $123,000, plaintiffs arrived at the final figure. Again, plaintiff failed to prove losses beyond the insurance recovery. Accordingly, the court refused to award the claimed damages.

22. Increased Labor Costs in the amount of $106,500. This item represents the cost of the non-productive activities of officers, non-officers and new employees. Maurice Rosenberg testified to his method of calculation and presented worksheets breaking down the claim by employee, date and number of hours. The court found the estimate of 50 hours overtime per week per officer excessive, and reduced this item accordingly.

## DELAY DAMAGES

The court awarded delay damages. Defendant argues that (a) Rule 238 is unconstitutional under both the Pennsylvania and United States Constitutions; (b) under 53 P.S. §5311.404 The Political Subdivisions Tort Claims Act (PSTCA) Rule 238 does not apply to the City; (c) Rule 238 applies to only certain categories of damages awarded; (d) the City made a written offer of settlement.

(a) Under Article 5 §10(c) of the Pennsylvania Constitution, "The Supreme Court (has) the power to prescribe general rules governing practice, procedure and the conduct of all court . . . if such rules . . . neither abridge, enlarge nor modify the substantive rights of any litigant." When Rule 238 was promulgated, Mr. Justice Roberts did not join in the order (Order, November 20, 1978, 480 Pa. XXXIII (1970)) on the grounds that it was substantive rather than procedural. It is clear that the Pennsylvania Supreme Court considered this issue before promul-

gating the rule and concluded that it was constitutional. No reported appellate decision has held Rule 238 unconstitutional. The court finds that it is precluded from considering the questions.

(b) Section 404 of the Political Subdivisions Tort Claim Act (PSTCA), supra S5311 states, "No interest shall accrue prior to the entry of judgment." That act governs actions against municipalities arising out of their negligence in the care and control of property and limits damages which may be recovered in those actions.

The cause of action in this case arose April 16, 1978, prior to the effective date of the PSTCA (January 25, 1979). It provides: "This act . . . shall apply to all causes of action arising thereafter (i.e., after the effective date). Nothing in this act shall be construed to apply its provisions to any cause of action which arose . . . prior to such effective date." Clearly the PSTCA is inapplicable.

(c) Defendant failed to cite any Pennsylvania case in which a court has awarded delay damages on some items of damages but not others. The rule in no way suggests this.

Defendant argues that consequential damages are not compensatory damages and that delay damages should not be awarded. This argument is frivolous. There are only two categories of damages, compensatory and punitive. Consequential damages are clearly compensatory in nature. Defendant offers no authority to the contrary.

Defendant also urges that to award delay damages on lost profits is to grant interest on losses that have not yet occurred. If defendant had settled for a proper figure, which the Rule encourages defendants to do, the figure would have included an extrapolation of lost profits for a reasonable future period. Delay damages on lost profits are proper.

(d) Under certain carefully specified conditions, a court may not award plaintiff delay damages. Pa.R.C.P. 238(e). One of these conditions is the plaintiff's receipt, "prior to trial" of a "written offer of settlement in a specified sum". Defendant claims the City made a written offer of settlement. However, at argument defendant's counsel admitted that the only document prepared was a typed breakdown of damages which did not state that the City was offering to settle the claim for a specified sum. Neither plaintiffs' nor defendant's files showed any other evidence of a written offer. An oral offer of settlement is not sufficient under the Rule.

## PUNITIVE DAMAGES

Plaintiffs except to the court's refusal to award punitive damages. There is no doubt that under the facts of this case, showing a reckless disregard for the safety and welfare of others, that an award of punitive damages would be appropriate. If the defendant were a private corporation, not a public body, this court would award punitive damages in the sum of $200,000.

In the United States today, punitive damages are allowed in all but four states. Pennsylvania customarily permits an award of punitive damages against a private individual or corporate defendant at the discretion of the judge. The majority of states in which the issue of awarding punitive damages against a public body has reached the appellate courts refuse to award such damages. This subject has received cursory, conflicting and inadequate examination by the Pennsylvania courts. For a good discussion of the decisions see Punitive Damage Liability of Municipal Corporations, 84 Dickinson L. Rev. 267 (1980). No recent reported Pennsylvania

appellate decision analyzes punitive damages against municipal corporations.[5]

The rationale for punitive damages is generally stated to be three fold: compensation, retribution and deterrence. See note 70 Harv. L. Rev. 520-522 (1967). The award of punitive damages historically derives from the reluctance of English courts in the seventeenth century to permit adequate recovery for plaintiffs. It is clear that under Pennsylvania law when adequate compensatory damages are awarded, punitive damages are not needed to compensate the injured party.

Retribution as a factor in civil damages may be traced to the early mingling of criminal law and torts. Under Anglo-Saxon law, a common penalty for crimes was the wirgild, an award of monetary payment by the offender to the victim of the crime or his family. As the two branches of law diverged, it was established that criminal fines were payable to the state, not to the victim, and that in torts the wrongdoer paid damages to the victim of his wrongdoing. Some acts of misconduct constitute both a crime and a tort. At present, there is a strong movement to require criminal offenders to pay restitution and reparations to the victims of crime as a part of the criminal sentence.[6]

---

5. See e.g. Hennigan v. Atlantic Refining Company, 282 F. Supp. 667 (E.D. Pa. 1967) (applying Pennsylvania law), aff'd. 400 F.2d 857 (3d Cir. 1968), cert. denied, 395 U.S. 904 (1969) which relies on a misinterpretation of Orders of Hermits of St. Augustine v. County of Philadelphia, 4 Clark 120, 7 Pa. L.J. 123 (1847). cf. Santucci v. Windber Borough, 31 Som. L.J. 281 (1975) (refusing to follow Hennigan for this reason).

6. See e.g. Pa. Sentencing Code specifically authorizing restitution 18 P.S. §1106.

Whatever justification there may be for retribution in criminal law,[7] in civil law it is inappropriate, particularly with respect to corporate defendants which act only through agents. Deterrence is, therefore, the only viable reason for awarding punitive damages in civil cases. It is assumed that an individual defendant who has been grossly negligent will be deterred from such future conduct by being required to pay punitive damages. Payment of punitive damages by a corporation will redound to the disadvantage of the presumably innocent shareholders. See Roginsky v. Richardson-Merrell, Inc. 378 F.2d 832 (2d Cir. 1967). However, one can expect that grossly negligent corporate agents and employees will be demoted or discharged.

When gross negligence is committed by the employees of a municipal corporation, there is rarely, if ever, any disciplinary action taken against them. In the case at bar, none of the City employees responsible for failing to secure or clean the Impervious building has been demoted, discharged or disciplined for their negligence which might have foreseeably resulted in great loss of life. In addition to plaintiffs' losses, the taxpayers have had to bear the expense of fire fighting, street cleaning and other incidental costs of the fire. This is not an anomalous situation. In recent years the City has paid several hundred thousand dollars in damages resulting from police misconduct toward civilians. There is no record that any of the officers involved has been discharged, suspended or demoted even though several police officers have been involved in two or more

---

7. The more civilized view of penology predicates criminal penalties on deterence, rehabilitation and protection of society rather than retribution, vengeance or punishment.

incidents.[8] Similarly, convictions of criminal offenders have been set aside by appellate courts in at least a dozen cases because of prosecutional misconduct by Philadelphia Assistant District Attorneys. None of them has been discharged, although the cost of retrials is considerable and the possible release of guilty defendants is costly to the safety of the community. The court concludes that imposition of punitive damages against the City is unlikely to have any deterrent effect.[9]

Accordingly, it is ordered that judgment be entered in favor of plaintiffs and against defendant in the sum of $610,152.96 with delay damages from October 17, 1969 to June 11, 1981.

---

8. *Union contracts may, of course, make disciplinary action difficult.*

9. This fire arose prior to the Municipal Subdivisions Tort Claims Act, supra. The act, although limiting recoveries against municipalities, does not address the issue of punitive damages.